UNITED STATES of America, Appellee,

v.

Alex CORCIONE, Michael Corcione, and Vito Pesce, a/k/a "Vic Pierce," Defendants-Appellants.

Nos. 437, 494, 495, Dockets 78–1265, 78–1266, 78–1267.

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1978.

Decided Jan. 26, 1979.

Certiorari Denied March 26 and April 2, 1979.

See 99 S.Ct. 1545, 1801.

**112**

Joseph W. Ryan, Jr., Mineola, N.Y., for defendant-appellant Alex Corcione.

Paul Zsuffa, Mineola, N.Y., for defendant-appellant Michael Corcione.

Leonard J. Levenson, New York City, for defendant-appellant Pesce.

Douglas K. Mansfield, Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E.D.N.Y., Harvey M. Stone, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD and OAKES, Circuit Judges, and BARTELS, District Judge.*

MANSFIELD, Circuit Judge:

The principal issue raised by this appeal is whether the Government involved itself so extensively in the commission of the crimes charged against appellants that, despite the absence of any entrapment, the indictment should be dismissed on due process grounds. See *Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 48 L.Ed.2d 113 (Powell, J., concurring), 495–500, 96 S.Ct. 1646 (Brennan, J., dissenting)

* Of the United States District Court for the Eastern District of New York, sitting by designation.

(1976); *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). We hold that the Government's enforcement activity did not violate appellants' due process rights.

Alex Corcione, Michael Corcione and Vito Pesce appeal from judgments of the Eastern District of New York entered on July 12, 1978, after a jury trial before Judge Edward R. Neaher convicting them of possession of heroin on November 15, 1977, with intent to distribute, 21 U.S.C. § 841(a)(1). In addition Pesce was convicted of attempting to import heroin into the United States, 21 U.S.C. §§ 952, 960.[1] Reversal is sought on various grounds, including, in addition to the claim that the Government violated appellants' due process rights by becoming over-involved in the offenses, contentions that the jury was inadequately charged regarding use of prior convictions, that the court's modified *Allen* charge was improper, and that the court erroneously admitted into evidence a note written by appellant Pesce which had been seized in violation of his Fourth Amendment rights. Finding no merit in these contentions, we affirm.

The record, viewed most favorably to the Government, discloses that in July of 1977 one Louis Hartman agreed in New York with appellants that he would try to find for them a source in Thailand that would supply large quantities of heroin for which they were willing to pay $3,500 per kilogram delivered in Bangkok. After arrival in Thailand, Hartman, through one Preecha Sirorasa ("Preecha"), found a source who, unknown to Hartman or Preecha (and, of course, unknown to appellants) was a Drug Enforcement Administration ("DEA") informant. As a result of international telephone negotiations with appellants, Hartman agreed to deliver heroin to them in New York for $38,000 per kilogram. Preecha, using funds advanced by appellants, went to New York where he negotiated the planned heroin purchase, receiving $10,000 as a cash advance from Michael Corcione

and agreeing with him that the code word for heroin would be "rubies." Upon receiving the $10,000 in Bangkok, Hartman paid $7,500 to the informant who bought 1.4 kilograms of 90% pure heroin. Hartman discussed with the informant the method to be used to smuggle the heroin into the United States; the heroin was to be carried in a suitcase in which the informant would place Thai shirts and rice samples as a "smoke screen" to throw customs examiners off the trail. After discussions in New York with Michael and Alex Corcione, Preecha went to Bangkok where he described to Hartman the plan for delivery of the heroin by Hartman and the informant to appellants in New York. It was agreed that Hartman and the informant would fly on the same plane from Bangkok to New York, with the informant carrying the suitcase supposed to contain the heroin, that upon arrival the informant would take the suitcase to the Traveler's Motor Lodge, that Hartman would go to a different location from which he would call Alex or Pesce who would then pick up the heroin from the informer, and that Hartman's stepson, Tawidnai, would serve as interpreter. Pursuant to agreement by telephone Pesce wired $2,500 for Tawidnai's travel expenses to Hartman in Bangkok. Unknown to Hartman or appellants, the heroin was turned over in Bangkok by the informant to a DEA agent and brought by him to the United States in a suitcase identical to that which Hartman and the informant planned to use to smuggle the heroin into the United States for delivery to appellants.

On November 15, 1977, Hartman and his stepson arrived with the informant at Kennedy Airport after flying from Bangkok. The informant had a suitcase with a false compartment which was believed by Hartman and appellants to contain the heroin that had been purchased by the informant for Hartman in Thailand. At the baggage claim area of the airport, DEA agents secretly substituted for this suitcase the other identical suitcase with its false compart-

---

1. All three of the appellants were acquitted of the charge of conspiracy to import and possess heroin, and the Corciones were acquitted of the charge of attempting to import heroin into the United States.

ment containing soap powder plus .014 grams of the same heroin that had been purchased by the informant and brought over earlier by the DEA from Bangkok to the United States. When arrested in transit from the airport to his hotel, Hartman had in his possession an envelope bearing the name and telephone number of Alex Corcione, plus a hand-drawn map showing the route from Kennedy Airport to the Traveler's Motor Lodge near LaGuardia Airport. After agreeing to cooperate with the DEA, Hartman telephoned Pesce who advised Hartman that in one hour the Corciones would meet him in the cocktail lounge of the Holiday Inn near the Traveler's Motor Lodge.

Hartman and the informant had divided a dollar bill between them, each keeping one half. Approximately one hour after the phone call to Pesce, Hartman received a telephone call at the bar of the Holiday Inn. Hartman went outside, met Michael and Alex Corcione, handed his half of the dollar bill to Alex and had a conversation with him. The Corciones then drove to the Traveler's Motor Lodge and Michael met the informant, who still had the suitcase containing the soap powder and heroin in the secret compartment. Michael said "Louis Hartman" and showed his half of the dollar bill; the informant said "Preecha" and showed the other half of the dollar bill. Corcione then identified himself as Michael and explained that Alex and Pesce were waiting in the car.[2] Michael asked for and was shown the suitcase, and in response to Michael's question "Ruby?" the informant answered "two kilos." Michael told the informant that Hartman's stepson would pay him the following day. Michael left with the suitcase, placing it in the trunk of the waiting car. DEA agents followed the car and eventually the Corciones were arrested after a high speed chase. The suitcase with heroin and soap powder was seized from the trunk, and the half dollar bill earlier held by Hartman was still in Michael's possession.

After that arrest, at approximately 1:00 A.M., Hartman called Pesce again, informing him that Hartman had given "them" the "protocol." In response to Hartman's question, Pesce said that payment would be made within 24 hours. DEA agents then proceeded to a two-story, two-apartment house owned by the father of Pesce's stepbrother. Upon ringing the doorbell the agents were admitted by the stepbrother, who lived in the downstairs apartment. Pesce was on the landing outside the front door to his upstairs apartment, and was placed under arrest. There was no arrest warrant. After Pesce and the agents went into the kitchen of Pesce's apartment so that he could get dressed the agents spotted on the kitchen table a handwritten note which simply read "Holiday Bar—Near Travelers." The note was seized and introduced into evidence at trial.

## DISCUSSION

Appellants argue that the DEA was overinvolved in the crime for which they were convicted, thus violating due process. Entrapment was not asserted as a defense below, and it is specifically rejected by appellants before this court, presumably because there is clear evidence of predisposition to commit the crime. Appellants, however, point to the facts that the Government informant not only bought and took delivery of the heroin in Bangkok but purchased the identical suitcases with the secret compartments and stuffed the heroin into one of the suitcases, a DEA agent transported that suitcase containing all of the heroin into the United States, the DEA refilled the secret compartment of that suitcase with the soap powder plus a small amount of the same heroin, the DEA switched the suitcases at Kennedy Airport, putting the suitcase containing a small amount of the heroin into the informant's possession, and the informant brought this suitcase through customs, turning it over later to appellants. Appellants argue that this "conduct of law enforcement agents is so outrageous that due process principles

---

**2.** Pesce was not in fact in the car outside.

would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). We disagree.

■ Although it has been suggested by the Supreme Court and ourselves that Government involvement in a crime may become so extensive and outrageous in a given case that due process would prohibit conviction of the defendants even though they concededly were predisposed to commit the crime, see *Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 48 L.Ed.2d 113 (Powell, J., concurring), 495–500, 96 S.Ct. 1646 (Brennan, J., dissenting) (1976); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), this is not such a case. Government infiltration of and limited participation in drug-related criminal enterprises is "a recognized and permissible means of investigation" necessary to gather evidence of illegal conduct. *United States v. Russell, supra*, 411 U.S. at 432, 93 S.Ct. 1637. See also *United States v. Archer, supra*, 486 F.2d at 676–77.

In *Russell*, a Government agent provided an essential and scarce, but not illegal, chemical necessary for the manufacture of methamphetamine to a group already engaged in such illegal manufacturing. The Supreme Court affirmed the conviction for illegal manufacturing, holding that since there was predisposition there was no entrapment and that the Government involvement was not so extensive as to offend due process. In *Hampton*, there was even more Government involvement. The defendant was convicted of selling to a Government agent heroin which had been supplied by a Government informant to the defendant for sale to the agent. A majority of the Supreme Court again upheld the conviction since there was predisposition. Of the majority three justices took the position that Government over-involvement could never require reversal of a conviction and two concluded that there was not such over-involvement on the facts of that case. See *Hampton v. United States, supra*, 425 U.S. at 488–90, 96 S.Ct. 1646, 48 L.Ed.2d 113

(opinion of Rehnquist, J.), 491–95, 96 S.Ct. 1646 (opinion of Powell, J.).

In the present case, the crimes for which appellants were convicted were initiated by them, not the Government. Before the Government ever became involved, appellants arranged with Hartman to buy large quantities of heroin. It was Hartman and Preecha, in turn, who sought out the person who fortuitously turned out to be an informant and enlisted his aid to purchase the heroin for them and appellants. It was Michael Corcione, not the Government, who advanced the money to Hartman specifically for the purchase of the heroin, without any urging or instigation by any Government representative to get into the heroin business. And it was Hartman and Preecha, according to Preecha's testimony, who devised the method to be used for smuggling the heroin into the United States, including the use of a suitcase with bags of rice as a decoy.

■ Although the Government, once the informer had been enlisted in appellants' arrangement for purchase, smuggling and possession of the heroin, became extensively involved, its role was limited to facilitating what the appellants had started and were executing. The informant, for instance, merely followed Hartman's and Preecha's instructions, departing from them only to the extent necessary to prevent appellants from obtaining as much heroin as they had anticipated. The transportation of the heroin by the DEA agent and substitution of a much smaller amount for that which appellants believed they were receiving likewise simply carried out the blueprint devised by Hartman and Preecha but did so in a manner designed to minimize the risk that appellants would come into possession of the full amount of the heroin they expected to receive. In short, the Government's participation here, far from being outrageous or offensive, represented an example of effective law enforcement work, without which appellants, already embarked upon a large-scale heroin operation, could not have been brought to bay.

The conduct of Government agents in *United States v. Archer*, 486 F.2d 670 (2d

Cir. 1973), is easily distinguishable. There they did not simply collaborate with persons already engaged in criminal activity for the purpose of apprehending them. Instead, based on general suspicions of corruption in the New York criminal justice system, they staged a purported crime, lied to New York police officers about it, misled a city magistrate, committed perjury before a New York grand jury, and caused the bribery of a state assistant district attorney, thus demonstrating "an arrogant disregard for the sanctity of the state judicial and police processes." *Id.* at 677. No such egregious conduct appears here.

3. The instruction requested by appellants read as follows:

> "The testimony of a witness may be discredited by a showing that the witness has been convicted of a crime or has engaged in any immoral or dishonest act. You may take such a showing into account in determining whether or not to believe the witness's testimony. You have read testimony that Viroy Hu Vonan has been convicted of possession of 3 counterfeit bills which involves an immoral and dishonest act. You may consider this showing in evaluating his testimony.
>
> "Likewise, you have head [sic] the testimony of Preecha Siroras and his prior conviction of crimes involving immoral or dishonest acts. You may likewise consider this in evaluating his testimony."

4. The district court instructed the jury as follows:

> "In this case there are certain special considerations with respect to two of the witnesses for the government who testified here before you. I refer first to Huvanon, the Thai police informant who acted for the DEA agents. In considering his testimony you may take into account that in certain types of crime the government, of necessity, is compelled to rely upon those who are willing to consort with criminals or persons suspected of crime for the very purpose of obtaining information and evidence needed to maintain a prosecution. Indeed, it would be most difficult to detect or prosecute some wrongdoers, and this is particularly true in conspiracy cases. Informers are themselves often in trouble with the law or have prior records, which makes it possible for them to be accepted by persons engaged in crime as one of their own.
>
> "In this case, Huvanon has testified that in exchange for his activities, information and testimony he has received a substantial reward and expects to receive more. The testi-

■ Appellants next assert that the trial court erred in refusing to give a requested jury instruction concerning the prior convictions of the Government informant and of Preecha.[3] We disagree. Evidence of the prior criminal records of Preecha and the informant was before the jury. Judge Neaher in his instructions specifically charged the jury that the testimony of the informer and the confessed accomplice must be examined with great care and caution because informers are often in trouble with the law and motivated by money or immunity from punishment and Preecha was a confessed criminal.[4] Under these circum-

mony of an informer who provides evidence against a defendant for pay, or for personal advantage or vindication, or for immunity from punishment for his own acts, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. You must determine whether the informer's testimony has been affected by interest or by prejudice against a defendant.

"If you find Huvanon's testimony was deliberately untruthful, you should unhesitatingly reject it.

"On the other hand, if upon a cautious and careful examination, you are satisfied that he has given a truthful version of the events which occurred, beyond a reasonable doubt, there is no reason why you should not accept it.

"The testimony of Preecha Siroros must also be examined with great care and caution. He has admitted before you that he was involved with Louis Hartman and others in the conspiracy and therefore is an accomplice. Nevertheless, it does not follow that because Siroros acknowledged participation in a crime or is an accomplice that he is not capable of giving a truthful version of what occurred.

"You should ask yourselves these questions:

"Did Siroros give false testimony, or color his testimony, contrary to fact, because he has not been prosecuted on the remaining charges or believes that his cooperation may result in more lenient treatment?

"If you find his testimony was deliberately untruthful, you should unhesitatingly reject it.

"On the other hand, if, upon a cautious and careful examination, you are satisfied that he has given a truthful version of essential events, beyond a reasonable doubt, there is no reason why you should not accept it."

stances it was not error to refuse to give the defendants' requested instruction *in haec verba.*

■ Appellants next assert that the modified *Allen* charge given by Judge Neaher was coercive. We do not agree.

At approximately 6:00 P.M. on the second day of its deliberations the jury sent out a note to the effect that it could not reach a unanimous verdict as to any defendant on any count. The trial court then gave a modified *Allen* charge [5] and asked the jury to decide for itself whether further deliberations would be productive in light of the *Allen* charge or whether it was time to stop. The jury responded through a note that it had agreed to stay and deliberate further.

Its deliberations then proceeded for almost four more hours before a verdict was reached. We do not feel this was a coerced verdict under the circumstances. *United States v. Robinson,* 560 F.2d 507 (2d Cir. 1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 58 L.Ed.2d 496 (1978). Speculation by the appellants that the jury was coerced because of the time of day, the meal schedule and the fact that it was the night before Good Friday is unsupported by the record.

■ Finally, appellants argue that the admission of the handwritten note taken from Pesce's kitchen constituted reversible error, relying on *United States v. Reed,* 572

---

5. The judge's charge reads as follows:

"Members of the jury, I have your note saying you are unable to reach a unanimous verdict in the case on any count as to any defendant. There is no question that you have been deliberating for a substantial period of time as you indicated some 19 hours.

"I assume that in that time each of you has had the opportunity to present your individual views about the case that you consulted with one another and listened to and thought about the arguments of your fellow jurors and after careful consciencious [sic] consideration of the evidence have nevertheless arrived at different views as to how the issues in the case should be decided.

"Before I declare a mistrial and discharge you, however I must point out that although the trial has not been a terribly long trial as trials go in this court these days, it has not been without considerable expense in money and human effort to the parties.

"If your deliberations don't end in agreement on a verdict the case is necessarily left open and undecided and in all likelihood will have to be tried again before another jury, a jury which will have to be selected in the same manner and from the same sources as you have been chosen.

"There appears to be no reason to believe the case will be better tried or reveal any more or different evidence than you have heard nor is there any reason to believe that 12 different men and women will be more intelligent, more impartially chosen or more competent to decide the case than you.

"Now, these considerations are but a reminder that the essential task is one of consciencious [sic] decision which I feel you are fully equipped to make and while a jury need not and must not surrender their consciencious [sic] convictions, nevertheless it is your duty as jurors to consult with one another and to deliberate with a view to reaching

agreement if you can possibly do so without doing violence to any judgment based upon a fair and impartial consideration of the evidence.

"As I said in my original charge each of you must decide the case for yourself but part of the process of thoughtful individual decision is such a consideration of the evidence and of the views of your fellow jurors with respect to that evidence.

"In the course of your deliberations you should not hesitate to reexamine your own views with candor and frankness and change your own opinion if convinced it's erroneous. I can't emphasize too strongly that each of you should give attention to the views of others, respect them and listen to each other's arguments with a disposition to keep your own views under continuing review.

"Now, what I have said may not help you deal with the differences that prevent you from reaching agreement. As I instructed you you are free to disregard everything the Court said, except the law as I have given it to you, but I would like to suggest that you reflect upon these thoughts for a few minutes and try to decide whether you feel that further period of deliberation would be so unavailing that you would not wish to undertake it.

"I know too, it is approaching the dinner hour. I am sure you have obligations at home. Having spent one night here you are not anxious to spend another but you are entitled to go to dinner if that is what you would wish to do. If you want to do that first all I can say is, what I have already said, and leave it up to your own good judgment as whether you think this is the time to stop or the time to try once more.

"Now, do you want to go outside and think that over for a while?"

F.2d 412 (2d Cir. 1978), decided after the convictions in the present case, wherein we held unconstitutional a warrantless arrest of a defendant in her own home, absent exigent circumstances, even though the arrest was based on probable cause. Again we must disagree. It is unclear whether *Reed* would apply to the facts of this case, since Pesce was arrested on the landing outside his actual apartment although inside the house owned by his stepbrother's father. We need not reach that issue, however, since the *Reed* decision is not retroactive. *Reed* relies upon the exclusionary rule "to enforce a constitutional guarantee that does not relate to the integrity of the fact-finding process," and the deterrent purpose of the exclusionary rule in such a case is not served where police officers obtained the evidence in good faith prior to the announcement of the new constitutional principle. *United States v. Peltier*, 422 U.S. 531, 535–37, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). Since the DEA agents in the present case clearly had probable cause to make the warrantless arrest and the handwritten note was in plain view after the arrest, there is no policy reason for applying *Reed* retroactively.

■ In any event, the admission of the note, even if it was error, was clearly harmless beyond a reasonable doubt, in view of the overwhelming other evidence against appellants. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Tape recordings of the two Hartman-Pesce telephone conversations were played for the jury, and the DEA agent who placed the Hartman call to Pesce testified as to the Hartman part of the conversation. The handwritten note was at best cumulative evidence of Pesce's involvement.

The convictions are therefore affirmed.