UNITED STATES of America, Appellee,

v.

Oscar Aldemar NUNEZ–RIOS and Miladys Nunez-Rios, Defendants-Appellants.

Nos. 1012, 1019, Dockets 79–1469, 79–1481.

United States Court of Appeals, Second Circuit.

Argued April 17, 1980.

Decided May 22, 1980.

---

Roger J. Hawke, New York City, for defendant-appellant Oscar Aldemar Nunez-Rios.

James M. Morrissey, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City), for defendant-appellant Miladys Nunez-Rios.

Robert S. Litt, Asst. U. S. Atty., New York City (William M. Tendy, U. S. Atty. for the Southern District of New York, Gregory L. Diskant, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MULLIGAN, Circuit Judge, SPEARS * and SWEET,** District Judges.

SWEET, District Judge:

Defendants Oscar Aldemar Nunez-Rios ("Oscar") and Miladys Nunez-Rios ("Miladys") appeal from judgments of conviction entered in the United States District Court for the Southern District of New York following a jury trial before the Honorable Henry F. Werker. Count One of the indictment charged Oscar, Miladys, Luis Angel Rios and Jorge Munoz Valencia with conspiring to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Count Two charged Miladys with possession with intent to distribute 495.81 grams of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2. Count Four charged Miladys with being an illegal alien in possession of a firearm, in violation of 18 U.S.C. App. § 1202(a)(5). The jury convicted Oscar and Miladys of each count in which they were named.

In this appeal Oscar claims that the district court erred by refusing to give an instruction permitting the jury to acquit him if it found excessive involvement by the Government in the crimes charged in the indictment. Miladys urges that her Fifth Amendment right to remain silent was abridged when the Government elicited testimony as to her silence following arrest, but before she had received *Miranda* warnings, and when the Government, in its closing statement, argued that her silence after

---

* Honorable Adrian A. Spears, Senior District Judge of the Western District of Texas, sitting by designation.

** Honorable Robert W. Sweet, District Judge of the Southern District of New York, sitting by designation.

arrest impeached the credibility of her exculpatory testimony. We reject both arguments and accordingly affirm the convictions.

The principal witness for the Government was John Featherly, an undercover agent of the Drug Enforcement Administration ("DEA"). Featherly testified that on August 20, 1979 at 3:00 p. m., he and two other agents went to the Brass Rail Restaurant in Manhattan to meet an informant named Henry. The agents observed Henry meet and speak with Oscar and Luis Rios.

At 9:00 p. m. on that same evening Featherly returned to the Brass Rail and, posing as a narcotics purchaser from California, joined Henry, Oscar and Luis Rios at a table. Featherly testified that Henry acted as an intermediary in negotiating the purchase of a pound of cocaine from Oscar. Henry conversed with Oscar and Luis Rios in Spanish and with Featherly in English. Featherly, who speaks no Spanish, testified that he also negotiated directly with Oscar in English. After some discussion as to the place and time of delivery, Oscar agreed to meet Featherly at 7:00 p. m. the next evening at the Americana Hotel in Manhattan, at which Featherly claimed to be staying, to deliver one kilogram of cocaine for $32,000.

Agents of the DEA and Immigration and Naturalization Service ("INS") established surveillance near the hotel at about 6:00 p. m. on the next evening. At about 7:30 p. m., Featherly met Oscar. Speaking in English, Oscar introduced Featherly to his sister, Miladys, who was carrying a buckskin handbag under her arm. Oscar suggested that they retire to Featherly's room to complete the transaction, but Featherly asked to see the drugs first. The three walked outside the hotel. Oscar told Featherly that the contraband was in his sister's purse, and Miladys held the purse forward and nodded. Featherly testified that they then walked back into the hotel. Featherly told Miladys and Oscar to take the elevators to the fifth floor, where his room was located.

When the appellants arrived on the fifth floor, they were arrested by DEA agents.

Agent Ridler testified that he seized Miladys' buckskin bag and opened it. The bag contained 495.81 grams of 43.5% pure cocaine and a fully loaded .44 caliber magnum revolver. Ridler testified that as he took the gun out of the purse, Miladys said nothing and that he observed no reaction on her part. The defendants did not object to this testimony.

Oscar and Miladys were transported to DEA headquarters. At approximately 9:00 p. m., an INS agent, Frank DiCostanzo, interviewed Miladys. DiCostanzo testified that Miladys, after being advised of her rights, told him that she had received the drugs and the firearm from a lady whom she did not know. The lady had telephoned her and offered to pay her $200 if she would pick up a package in "Grand Central Park" and deliver it. She stated that she did not know what was in the package.

Oscar, Miladys and Luis Rios all testified at trial. Oscar stated that he was 23 years of age and supported five dependents in Colombia. He had been in the United States for four years, but had lost his job on July 30, 1979 and was unemployed. He testified that he knew only a few words of English.

Oscar admitted that he had been at the Brass Rail at 3:00 p. m. on August 20, 1979, but denied meeting Henry at that time. He testified that he and Luis Rios had been at the bar of the Brass Rail at 9:00 p. m. on August 20 and that Henry and a friend had approached them. Oscar stated that Henry had made homosexual overtures to him while standing at the bar and that he and Luis had sat down at a table with Henry and his friend and ordered drinks. Five or ten minutes later Agent Featherly had approached the table, made a homosexual remark to Henry and joined the group.

Oscar stated that the group remained at the table until midnight. Oscar conversed with Henry in Spanish, and when Featherly addressed remarks to Oscar in English, Henry translated. Oscar denied hearing any discussion concerning the sale of narcotics.

At some point in the evening, Henry told Oscar that he would pay him $200 if he would deliver a package to Featherly the next day. Oscar testified that because of his need for money, he agreed to do so even though he suspected that the package might contain drugs. Oscar arranged to meet Henry at what was then the Americana Hotel at 7:00 p. m. the next evening. He and Miladys went to the hotel; Miladys waited at the entrance, while Oscar, carrying his sister's handbag, walked to the streetcorner to meet Henry. Henry placed a package inside Miladys' pocketbook and told him that he would pay him $200 once the delivery to Featherly had been completed. Oscar testified that he and Miladys met Featherly at the bar and followed him outside. Featherly made a gesture of inquiry about the package, and Oscar said "yes" and pointed to his sister's buckskin bag. When they returned inside the hotel, Featherly instructed them to go to the fifth floor, where they were placed under arrest.

Miladys testified that she had never discussed drugs with her brother, and that on August 21, 1979, he had told her that they were going to a party. She denied seeing either a gun or white powder when they left their house. She testified that upon arriving at the hotel, Oscar asked to borrow her purse, "so that they could put in something that was supposed to be put in there," but he did not specify what that something was. When Oscar returned the pocketbook, Miladys noticed that it was heavy; yet, she did not look inside and could not tell by feel what the purse contained.

Miladys testified that she discovered what was inside when she was arrested. She admitted making a false exculpatory statement to Agent DiCostanzo, but said that she had done so in the hope of helping her brother. On cross-examination, Miladys contradicted her direct testimony by denying that Oscar had told her that "he needed the pocket book so that he could put something in it that had to be in it."

In its rebuttal case, the Government presented DEA Agent Hubert Shockley, who testified that he had observed Oscar conversing with Henry at 3:30 p. m. on August 20 at the Brass Rail. He further testified that he had spoken with Henry, the informant, on August 21 at approximately 7:25 p. m. in a bar five or six blocks from the Americana Hotel. DEA Agent Lewis Rice testified that he and other agents had maintained surveillance at the corner of 52nd Street and Seventh Avenue—the corner on which Oscar had supposedly met Henry—between 6:30 p. m. and 7:30 p. m. on August 21. Rice testified that he did not observe Henry on that corner during that time.

The key contention in Miladys' defense was that she did not know that her purse contained cocaine and a .44 caliber magnum handgun prior to her arrest. To rebut this contention the prosecutor made the following argument in his summation:

> As you recall . . . Agent Featherly sends them [Oscar and Miladys] to the fifth floor where they were arrested. There Agent Ridler found the gum . . and the cocaine . . . inside the purse. He takes the purse from Miladys and opens it in her presence.
>
> What happened when he took this gun out of her purse, ladies and gentlemen? Nothing. She didn't say anything. She didn't register any surprise.
>
> Ladies and gentlemen, if somebody took your pocketbook and opened it and took this gun out, and you didn't know it was in there, don't you think you would register a little surprise, especially when you saw it was fully loaded? Would you be concerned about having carried a .44 caliber magnum revolver in your purse and not know about it. She wasn't surprised because she knew it was in there.

Counsel for Miladys objected, and, at the conclusion of the prosecutor's closing argument, the court instructed the jury as follows:

> Ladies and gentlemen, Mr. Litt made mention of the fact that Miladys Nunez-Rios didn't say anything when she was arrested. I tell you now that is not a proper comment because she is under no obligation to say anything. Under the

constitution she has a right to remain silent.

The trial court denied Miladys' motion for a mistrial based on this remark.

Judge Werker refused Oscar's request that he charge the jury that

. . . if you find that the Government informant in fact solicited Nunez-Rios with an offer to pay him a sum of money to deliver the package to the Government agent, and that the informant thereafter supplied the package to Nunez-Rios for delivery, that this would constitute undue overinvolvement by the Government in the alleged crime which would be violative of the defendant's constitutional right to due process of law. In that event, you would be obliged to find the defendant not guilty even though you were to conclude that he was predisposed to commit the alleged crime.

Judge Werker did instruct the jury with respect to the defense of entrapment, as requested by Oscar. Oscar does not challenge the correctness of that charge.

The jury convicted Oscar and Miladys of a conspiracy to violate the narcotics laws, and found Miladys guilty of possession with intent to distribute cocaine, and of being an illegal alien in possession of a firearm. The jury rejected Oscar's claim that he was not predisposed to enter into a conspiracy to violate the drug laws, and Miladys' contention that she was unaware of the contents of her purse.

Oscar Nunez-Rios claims that he was entitled to have the jury consider his claim of excessive over-involvement and that the trial court erred in refusing to charge the jury with respect to his claim of excessive government involvement. We disagree on two grounds.

■ First, Judge Werker correctly ruled that this defense did not apply to the facts alleged by Oscar. Oscar testified that the informant, Henry, initiated the drug transaction and in fact provided him with the drugs which he then sought to deliver to Featherly. This claimed version of the facts falls short of the kind of outrageous conduct which would violate the defendant's due process rights.

In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the defendant claimed that a person, who he later discovered to be an informant, invited him to become involved in a drug transaction and supplied him with drugs which the defendant attempted to sell to undercover agents. leading to his arrest. Five members of the Supreme Court agreed that the defendant was not entitled to the requested instruction based on the facts as he described them. Justice Rehnquist, writing for three members of the Court, stated that the defendant's remedy for the conduct alleged "lies solely in the defense of entrapment." 425 U.S. at 490, 96 S.Ct. at 1650. Justice Powell, joined by Justice Blackmun, agreed that the defendant's due process rights would not have been violated simply because the informant supplied the narcotic substance distributed by him, but left open the possibility that overzealous enforcement tactics could violate a defendant's due process rights in another case. Justice Powell stated, however,

I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement.

Id. at 495 n. 7, 96 S.Ct. at 1652 n. 7. See also *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

In *United States v. Corcione*, 592 F.2d 111 (2d Cir.), cert. denied, 440 U.S. 975, 985, 99 S.Ct. 1545, 1801, 59 L.Ed.2d 794, 60 L.Ed.2d 248 (1979), one defendant took funds to Thailand to buy drugs for his co-conspirators. He contacted a source, a Government informant, who took the money and used it to buy heroin. The informant then advised the defendant how to smuggle the drugs into the United States and, in fact, carried the suitcase containing the drugs onto the

plane. The informant delivered a substitute suitcase to the Corciones upon arriving in New York. The court refused to dismiss the indictment, relying on the fact that the conspirators had initiated the conspiracy prior to meeting the informant, and had executed most aspects of the crime. The court described the Government's conduct as "far from . . . outrageous." Id. at 115.

The participation of the Government alleged by Oscar is no more extensive than than that considered in *Hampton* and *Corcione*. In *Hampton*, as in this case, the defendant alleged that the informant had initiated the illegal transaction, had located a buyer and had supplied the narcotics. In *Corcione*, as in this case, the defendants claimed that the informant had supplied the drugs which they were charged with importing; in addition, the informant had carried them in his own luggage and delivered them to the recipients in New York. Accordingly, the alleged activities of Henry in suggesting that Oscar act as a courier and in supplying the drugs did not rise to "a demonstrable level of outrageousness."

The two cases upon which Oscar principally relies are distinguishable. In *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), Government officials arrested a "fake" underworld figure, in fact a Government agent, and had him lie to the police, a city magistrate and the New York grand jury as part of an investigation of political corruption. Because the convictions of the defendants were reversed on other grounds, this court did not decide the overreaching issue. Nevertheless, the court reprimanded the conduct of law enforcement agents, which amounted to "an arrogant disregard for the sanctity of the state judicial and police processes," id. at 677, under facts markedly different from those found here.

In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the defendants claimed that a Government informant had initiated the setting up of a drug manufacturing laboratory, provided essential chemicals and glassware and rented a site for the laboratory. The informant actually operated the labora-

tory, though assisted by the defendants. A split panel of the Court of Appeals for the Third Circuit found that this involvement indicated a "demonstrable level of outrageousness" which warranted reversal, but distinguished the manufacturing operation from "the sale of an illegal drug, a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory." Id. at 378.

Therefore the conduct alleged in this case does not rise to the level of serious misconduct or pervasive participation discussed in *Archer* and *Twigg*.

■ Second, the defense of outrageous Government conduct is not for the jury to consider, but must be decided by the trial court. In *United States v. Russell*, supra, 411 U.S. at 431–32, 93 S.Ct. at 1642–1643, the Court stated that this defense might arise only if the court were

> . . . presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .

The Court's description of this defense, reaffirmed in *Hampton v. United States*, at 495 (Powell & Blackmun, JJ., concurring in judgment) and id. at 497 (Brennan, Stewart & Marshall, JJ., dissenting), indicates that it is based on alleged "defects in the institution of the prosecution" itself. Fed.R. Crim.P. 12(b)(1). Accordingly, this defense is properly decided by the court and not the jury. See *United States v. Szycher*, 585 F.2d 443, 445 (10th Cir. 1978); *United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978); *United States v. Graves*, 556 F.2d 1319, 1321–23 (5th Cir. 1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978); *United States v. Quinn*, 543 F.2d 640, 648 (8th Cir. 1976).

■ Moreover, under Rule 12(b)(2), this defense should normally be raised prior to trial, so that the trial court can conduct a hearing with respect to any disputed issues of fact. Oscar was aware of the facts on which he relied to support his claim of

over-involvement, yet he made no motion prior to trial based on this defense. By failing to raise this issue prior to trial, Oscar waived the right to assert it on appeal. *United States v. Viserto*, 596 F.2d 531, 538–539 (2d Cir.), cert. denied, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *United States v. Easom*, 569 F.2d 457 (8th Cir. 1978); *United States v. Coppola*, 526 F.2d 764 (10th Cir. 1975). See also *United States v. Rodriguez*, 556 F.2d 638 (2d Cir. 1977), cert. denied, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978).

■ Miladys Nunez-Rios claims that the prosecutor's argument in his closing statement that her silence, when confronted with the contents of her purse following arrest, but prior to receiving *Miranda* warnings, could be considered as impeachment of her testimony, infringed her Fifth Amendment right to remain silent. The Government contends that the comment was proper, since it concerned Miladys' silence prior to receiving *Miranda* warnings, and that in any event the comment constituted harmless error due to the curative instruction given by the trial court.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecutor sought to impeach the defendants' testimony by asking them why they had not offered the exculpatory story which they presented at trial to the arresting officer after receiving *Miranda* warnings. The Supreme Court held that this questioning contravened the defendants' Fourteenth Amendment rights. The Court reasoned that because of the *Miranda* requirement that a person be advised of his right to remain silent and to an attorney, "every post-arrest silence is insolubly ambiguous . . . ." since "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." Id. at 617, 96 S.Ct. at 2244. The Court elaborated,

> Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

Id. at 618, 96 S.Ct. at 2245 (footnote omitted). The Court limited its holding to the "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings . . . ." Id. at 619, 96 S.Ct. at 2245.

In *United States v. Vega*, 589 F.2d 1147 (2d Cir. 1978), the defendant was prosecuted for her role in flying to Chicago, receiving drugs and flying back to New York with co-conspirators. The defendant took the stand at trial and explained that she had been unaware of the illegal nature of the venture until she arrived in Chicago and then decided not to notify authorities in Chicago because she had no money and needed to get back to New York. However, she admitted that she had failed to inform DEA agents in New York of her complicity in the illegal scheme prior to being arrested or receiving *Miranda* warnings. The prosecutor, in his closing, emphasized that this silence in the face of questioning cast doubt upon the defendant's credibility. This court held that the use of this pre-arrest, pre-*Miranda*-warning silence to impeach the defendant's credibility did not violate her Fifth Amendment rights. In view of the defendant's explanation for her failure to notify the police in Chicago, her prior inconsistent silence had considerable probative value. The court emphasized that two factors critical to the ruling in *Doyle*, that "the arrestee is in official custody and has been given the 'implicit representation implicit in the *Miranda* warnings that a defendant will not be penalized for his decision to remain silent,'" id. at 1150 (quoting *United States v. Shields*, 571 F.2d 1115, 1118 (9th Cir. 1978)) were absent. The court also held that by failing to raise a timely objection to the court's questioning and the prosecutor's summation, the defendant had waived his right to object, and that, in view of the substantial evidence of guilt against the

defendant, any impropriety had been harmless.

■ The Government urges that the reasoning of *Doyle* and *Vega*, which focused on the unfairness of assuring an arrestee that he may remain silent, then utilizing that silence against him, precludes recognition of a Fifth Amendment prohibition against use of an arrestee's silence prior to receipt of *Miranda* warnings for impeachment purposes. See 426 U.S. at 619 n. 10, 96 S.Ct. at 2251. However, in *United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975), the Supreme Court, in reversing a conviction due to the prosecutor's reference to the defendant's post-arrest silence, detailed a variety of reasons why silence at the time of arrest is of questionable probative value, even without *Miranda* warnings having been given. The Court in *Doyle* reiterated that "silence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings . . . ." 426 U.S. at 618 n. 8, 96 S.Ct. at 2244 n. 8. Moreover, although this court in *Vega* utilized a "compact" theory to explain why the ruling in *Doyle* was inapplicable in the pre-arrest context, 589 F.2d at 1150, it did not purport to determine what rule should govern once a defendant is actually arrested, id. at 1151.

Three factors militate against permitting the prosecution to comment upon the silence of a defendant after arrest but before receiving *Miranda* warnings. First, as discussed in *United States v. Hale*, supra, 422 U.S. at 177, 95 S.Ct. at 2137, even disregarding the effect of *Miranda* warnings, post-arrest silence is highly ambiguous and therefore lacks significant probative value. In this case, Miladys may have chosen to remain silent for any of a number of reasons, only one of which was guilt. She may have desired to avoid inculpating her brother in illegal activity, or she may have decided to remain silent out of simple fear. As the Court stated in *Hale*, supra at 177, 95 S.Ct. at 2137:

At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may

find the situation so intimidating that they may choose to stand mute.

This is not a case such as *Vega*, in which the defendant's silence tended to contradict her other testimony. See also *United States v. Serrano*, 607 F.2d 1145, 1152–1153 (5th Cir. 1979).

Second, regardless of the receipt of *Miranda* warnings, Miladys had a right to remain silent at the time of her arrest. As the New York Court of Appeals recently stated,

. . . the implied promise, contained in the *Miranda* warnings, that one's silence will not be used against one, is derived not from the words of the *Miranda* warnings, but from the actual constitutional guarantees which they express.

*People v. Conyers*, 49 N.Y.2d 174, 179–80, 424 N.Y.S.2d 402, 406, 400 N.E.2d 342, 346 (1980). The court further stated,

The implied promise made to a suspect where he is given *Miranda* warnings merely repeats and reiterates the promise already made by both [New York and Federal] Constitutions. Although it is necessary to repeat that promise in order to ensure that the suspect fully understands his constitutional rights, the failure of the police to do so does not serve to prevent a suspect from relying upon that promise.

Id. It is true, as the Government argues, that the right to remain silent exists independently of the fact of arrest, see *Dunaway v. New York*, 442 U.S. 200, 210 n. 12, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979), so that the reasoning of the New York Court of Appeals in *Conyers* would extend even to pre-arrest situations, see *United States v. Henderson*, 565 F.2d 900, 902 (5th Cir. 1978). Nevertheless, the protections of the Fifth Amendment assume greatest importance following arrest, when the arrestee is confronted with a direct accusation of criminal conduct. The prosecutor's argument "acted as an impermissible penalty on the exercise of the [defendant's] right to remain silent." *Douglas v. Cupp*, 578 F.2d 266, 267 (9th Cir. 1978), cert. denied, 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979); see also *United*

*States ex rel. Allen v. Rowe*, 591 F.2d 391 (7th Cir. 1979).

A third reason to extend the *Doyle* prohibition to post-arrest situations prior to advisement of *Miranda* rights is to encourage law enforcement officials to give *Miranda* warnings promptly. In the absence of such a prophylactic rule, police might have an incentive to delay *Miranda* warnings in order to observe the defendant's conduct. Indeed, in this case, the DEA agents withheld a recitation of *Miranda* rights until after one agent had opened Miladys' pocketbook and examined its contents. Since *Miranda* warnings are not required until the police commence interrogation, *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), this delay invited Miladys either to comment upon the contents of the purse by making an inculpatory statement or to provide the Government with an opportunity to impeach her later testimony by remaining silent. Although we do not intimate any impropriety in the brief delay by the DEA agents in this case, we think it is appropriate to adopt a rule which will promote the prompt recitation of *Miranda* warnings.

Although we hold that the Government's use of Miladys' silence at the time of arrest for impeachment purposes was improper, this use does not warrant reversal in this case. Counsel for Miladys' made no objection to the prosecutor's eliciting testimony concerning Miladys' silence, and thus waived the right to object to this error on appeal. See *United States v. Vega*, supra at 1152. When counsel did raise a prompt objection to the prosecutor's argument in closing, Judge Werker instructed the jury that it might not draw any conclusions from Miladys' silence. In giving this instruction, the trial court followed the procedure prescribed in *United States v. Conlin*, 551 F.2d 534, 537 (2d Cir.) cert. denied, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977).

In view of the substantial evidence of guilt in this case, the prosecutor's remark was harmless error. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Bradford v. Stone*, 594 F.2d 1294, 1297 (9th Cir. 1979); *United States v. Vega*, supra, 589 F.2d at 1153–1154 (harmless error despite absence of curative instruction). The only issue in the case was Miladys' knowledge of the contents of the bag. Featherly testified that when he asked where the drugs were, Oscar pointed to the purse and Miladys drew the purse from under her arm and nodded. Miladys, when interviewed by Agent DiCostanzo later in the evening, offered a patently absurd exculpatory story which she later repudiated. This false statement provided evidence of consciousness of guilt. See *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *United States v. Lacey*, 459 F.2d 86, 89 (2d Cir. 1972). Finally, Miladys' testimony that she accompanied her brother to the hotel, supposedly to look at tourists, handed her purse to her brother and took it back when it contained over a pound of drugs as well as a .44 caliber magnum handgun without inquiring as to its contents was highly implausible. Any error resulting from the prosecutor's statement was cured by the court's instruction and was harmless beyond a reasonable doubt.

For these reasons, the judgments of conviction of both appellants are affirmed.