**UNITED STATES of America**

v.

**Jose GONZALES, a/k/a Jose Menas, Appellant.**

**UNITED STATES of America**

v.

**RUIZ, Wilson, Appellant.**

**Nos. 90–5577, 90–5620.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Feb. 21, 1991.

Decided March 8, 1991.

---

Peter J. Scuderi, Philadelphia, Pa., for appellant Jose Gonzales.

Joseph C. Santaguida, Broad & Chestnut Streets, Philadelphia, Pa., for appellant Wilson Ruiz.

Edna B. Axelrod, Chief, Appeals Div., Leslie F. Schwartz, Asst. U.S. Atty., Michael Chertoff, U.S. Atty., Newark, N.J. for appellee.

Before GREENBERG and COWEN, Circuit Judges, and BUCKWALTER, District Judge *.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter is before the court on appeals by Jose Gonzales and Wilson Ruiz from judgments of conviction and sentence entered in this narcotics case. Appellants were caught in a reverse sting, an opera-

---

* Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

tion in which the government agents pretend to be selling rather, than as is the more usual case, buying narcotics from the soon-to-be defendants. From the point of view of the government a reverse sting includes the helpful aspect that it can produce a large amount of money available for a reward to the middle man as the criminals are buyers rather than sellers of the narcotics and their funds can be forfeited.

This is what happened. In the spring of 1989, the United States Customs Service had approximately three tons of marijuana subject to destruction, an inventory available for a large scale reverse sting. While a reverse sting could be set up without a controlled substance on hand, it was useful to have it for cases in which the purchaser wants to see the drugs before the money is produced. The Customs Service was interested in setting up the reverse sting to flush out major drug traffickers and to seize large amounts of assets. Accordingly, agent Julio Velez of the Customs Service advised Mark Vollmer, who had worked for the government before in such matters, to put the word out that there was a large amount of marijuana available for purchase. Vollmer's incentive for cooperating was the opportunity to obtain a reward of up to 25% of the value of any forfeiture.

During the summer of 1989, Vollmer's long-term acquaintance Carmelo Lopez came into a pizzeria where Vollmer was employed. When Vollmer saw him he concluded that Lopez had been using cocaine, an observation Lopez confirmed. Vollmer asked Lopez if he knew anyone who might be interested in purchasing a large quantity of marijuana, a suggestion not offensive to Lopez, as he indicated that he would check out the possibility. Thereafter the proposed sale was switched from marijuana to cocaine.

While there were some initial difficulties in moving ahead with a transaction, eventually, with Lopez's help as an intermediary, Vollmer met with Ruiz, Gonzales and James Hernandez on September 27, 1989. While the circumstances of the meeting are somewhat confusing there is no question but that the discussion involved controlled substances. Furthermore, there were telephone calls from the meeting to Velez who, in an undercover capacity, pretended to be the potential vendor. Thus, this was no innocent gathering.

Thereafter the pace of events quickened. On September 29, 1989, Vollmer drove Ruiz from Philadelphia to Pennsauken, New Jersey, to meet Velez who agreed to sell Ruiz and a partner 57 kilograms of cocaine for $780,000. Ruiz, obviously not a small-time dealer, indicated that he could later make further purchases. The $780,000 purchase, however, was not completed as Ruiz's associates, displaying considerable prescience, were distrustful of Velez, fearing that he might be a police officer. Ruiz, however, was not personally so circumspect as he asked Velez to sell him 25 kilograms for $350,000, a suggestion to which Velez had no difficulty agreeing, as there was not going to be a sale of anything at any price. The sale was to be completed on October 4, 1989.

On October 4, 1989, Lopez and Vollmer first met each other and then they met Ruiz, Hernandez, and Gonzales in Philadelphia at a van parked on a street. Hernandez opened the back of the van so that Ruiz could show the money for the purchase to Vollmer. The five men then drove to Hammonton, New Jersey, in the van, Gonzales driving. During the trip they discussed germane topics such as, ironically, whether Velez thought Ruiz was a police officer, the importance of not speeding, the type of cocaine involved, and the business nature of the trip.

The day's events culminated in the late morning when they met Velez near an exit of the Atlantic City Expressway. After Ruiz displayed a box of cash to Velez, Velez said that there was a great deal of cocaine where they were going so "don't do anything stupid," advice which the five men acknowledged that they understood. At that point surveillance teams moved in and everyone in the van was arrested.

A search revealed that Gonzales was in possession of false identification and sales tax and registration papers which showed

that the van was owned by a female residing at his address. The police also found $346,220 in cash in a box in the van and a fully loaded semi-automatic submachine gun in an overhead compartment.

As a result of these events Ruiz, Gonzales, Lopez and Hernandez were indicted for conspiracy to possess and distribute approximately 25 grams of cocaine, 21 U.S.C. § 846, the indictment including a provision noticing that a forfeiture of the van and the cash would be sought under 21 U.S.C. § 853. Thereafter, Ruiz, without the benefit of a plea agreement, decided to cooperate with the government by supplying information regarding his knowledge of the narcotics business and, on November 20, 1989, he pleaded guilty to the original indictment. Ruiz did, in fact, meet with government agents but they rejected his information as they considered it incredible.

On November 21, 1989, a superseding indictment was returned against Gonzales, Lopez, and Hernandez, again charging them with conspiracy to possess and distribute 25 grams of cocaine, and adding a count for carrying a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1). Gonzales, Lopez and Hernandez all pleaded not guilty but at an ensuing jury trial were found guilty on the conspiracy count and not guilty on the weapons count.

Ruiz and Gonzales were sentenced on June 28, 1990. Under the Sentencing Guidelines their base offense level was 34. *See* guidelines §§ 2D1.4 and 2D1.1. There was a 2-level increase in Ruiz's offense level due to his leadership role in the criminal scheme, *id.* § 3B1.1(c) but he received a 2-level reduction for acceptance of responsibility. *Id.* § 3E1.1. While Ruiz sought a further reduction in his offense level predicated on his cooperation with the government, the district court would not allow it as the government had not filed a motion under guidelines § 5K1.1. Predicated on his criminal history category of II and an offense level of 34, Ruiz's guideline range

of imprisonment was 168 to 210 months. He was sentenced to 210 months followed by five years of supervised release. Gonzales sought a 4-level reduction as a minimal participant under guidelines § 3B1.2(a) but the court rejected that request, though it did award him a 2-level reduction as a minor participant under guidelines § 3B1.2(b). Thus, Gonzales had an adjusted base level of 32 which, with a criminal history category of IV, resulted in a guideline range of 168 to 210 months. He received the same sentence as Ruiz, 210 months imprisonment followed by five years of supervised release. Gonzales and Ruiz have appealed from the judgments of conviction and sentence thereafter entered on July 5, 1990, and we have consolidated their appeals for disposition. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

 Gonzales raises an issue going to the validity of his conviction. He asserts that the government's use of Vollmer who he characterizes as "a contingent fee operative" violated due process of law.[1] Disposition of this issue requires a detailed description of Vollmer's arrangement with the government. Over a period of several years Vollmer had been providing information to the Drug Enforcement Agency and the Customs Service. While he was otherwise gainfully employed during that period in jobs not related to law enforcement, he was also paid by the government agencies, receiving advances against rewards and expense money. Vollmer explained at trial that "with drug dealers, there is a lot of money. There is a lot of assets seized. When this is seized, there is a forfeiture act. It's turned over to the government and I'm eligible for a percentage."

Vollmer could expect to be paid a maximum percentage of 25% of the assets recovered depending on the actual work in a case and the number of people working on it. The case agent in charge of a case makes the recommendation as to the amount of the reward but the final decision

---

**1.** Inasmuch as the facts with respect to this issue are largely undisputed and, to the extent in question, will be viewed from Gonzales's perspective, we are deciding this issue as a matter of law and therefore exercise plenary review.

is made by the senior officer in charge. Vollmer typically deals with the case agent and never deals with the senior officer. Vollmer testified that his reward was not dependent on the defendant's conviction, but he could not be paid unless there was a forfeiture to create the fund.

In harmony with his general understanding of his undercover work, Vollmer testified at trial that in this particular case it was not necessary for the defendants to be convicted for him to obtain a reward. But as he did have to appear at the trial and testify to obtain the reward, he understood that if he did not cooperate with the government he would not get paid. Furthermore, he recognized that the amount of the reward depended on the degree of his cooperation.

■ The government makes a procedural objection to Gonzales's due process argument, as it contends that under Fed.R. Crim.P. 12(b)(1) he was obliged to raise the due process contention prior to the trial. That rule provides that any defense or objection capable of determination without the trial of the general issue may be raised before trial by motion but that "[d]efenses and objections based on defeats in the institution of the prosecution" must be raised prior to trial.

There may well be some merit to the government's position. In *United States v. Nunez–Rios*, 622 F.2d 1093 (2d Cir.1980), a narcotics case involving an undercover operation, a defendant sought an instruction from the district court permitting the jury to acquit the defendant if it found excessive involvement by the government in the offenses charged in the indictment. *Id.* at 1094. The district court refused this charge, though it did instruct the jury on entrapment. *Id.* at 1097. On appeal the defendant raised the court's failure to charge as a basis for reversal. The court of appeals rejected this argument on the substantive ground that it did not find the government's actions rose to a level of serious misconduct or pervasive participation sufficient to be a due process violation. *Id.* at 1098.

The court of appeals went on, however, to point out that "the defense of outrageous Government conduct is not for the jury to consider, but must be decided by the trial court." *Id.* Accordingly, it regarded the defense as raising an issue relating to a defect in the institution of the prosecution which should normally be raised prior to the trial "so that the trial court can conduct a hearing with respect to any disputed issues of fact." *Id.* It then went on to hold that the defendant:

> was aware of the facts on which he relied to support his claim of over-involvement, yet he made no motion prior to trial based on this defense. By failing to raise this issue prior to trial, [the defendant] waived the right to assert it on appeal.

*Id.* at 1098–99.

We could then quite possibly predicate our decision on the procedural ground advanced by the government. But we are reluctant to do so for two reasons. In the government's brief it asserts that "Gonzales was furnished before trial with discovery concerning the reward policies of the Customs Service and the DEA" and therefore "could have presented this matter prior to trial, thus, enabling the trial court to elicit the necessary facts." Its reference to support this contention in the record is to a statement made by the assistant United States attorney who at the outset of the trial on Monday, April 2, 1990, indicated that:

> The government wants to put on the record the fact that last week, I believe on Wednesday or Thursday, it found out that the rewards policy of DEA, that it had distributed to the defense attorneys, was out of date. We did not know about that until that time. I apologize for it. I talked to the asset forfeiture people DEA. I was promised a FAX transmission. I finally got it Friday.

App. at 537.

The assistant United States attorney then said: "I called the defense attorneys. I explained it to them and gave them copies today."

It thus appears that the information on which the motion under Rule 12(b) could have been made was not available to Gonzales and the other defendants until the eve of the trial, apparently by way of out of time discovery. In the circumstances it is not fair to bar the due process contention on a waiver ground. Indeed, it may have been too late for them to make a Rule 12(b) motion when they were given the information as Local Rule 12F of the United States District Court for the District of New Jersey provides that defenses or objections permitted under Rule 12 "shall be made before pleading or with 30 days thereafter unless the Court at the time of arraignment on application of counsel otherwise specifies, or unless good cause is shown."

The second reason we are reluctant to reject the due process objection on the procedural basis advanced by the government is that it concedes that the matter probably could, in any event, be considered on a plain error basis. Accordingly, we will consider the due process objections on the merits.

In this regard we start by acknowledging that in certain extreme cases it is possible that "the conduct of law enforcement agents [may be] so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). Yet we must not be quick to find government conduct that outrageous for, as we said in *United States v. Janotti,* 673 F.2d 578, 607 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), "[w]e must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense is implicated." Furthermore, we are reminded by the Supreme Court that the problems confronting law enforcement authorities in dealing with the narcotics traffic cannot easily be exaggerated and that enforcement "officials therefore must be allowed flexibility adequate to counter such criminal activity." *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (concurring opinion).

We are at a loss to understand what the government did that was outrageous here. Gonzales simply tells us that the plan was "carried out primarily by an individual whose sole motivation was money. The receipt of that money was predicated upon consummating the deal and following through with court proceedings." Gonzales does not, of course, suggest that he was entrapped and, indeed, he appears to have been a willing participant in the transaction. Furthermore, several courts of appeals have rejected due process arguments similar to that advanced by Gonzales. *See, e.g., United States v. Cervantes–Pacheco,* 826 F.2d 310 (5th Cir.1987); *United States v. Hodge,* 594 F.2d 1163 (7th Cir.1979); *see also Hoffa v. United States,* 385 U.S. 293, 310–11, 87 S.Ct. 408, 417–18, 17 L.Ed.2d 374 (1966).

In reaching our conclusion we recognize that notwithstanding Vollmer's testimony that his fee was not contingent on a conviction, he did have an interest in the result of this case and we are deciding the appeal on that basis. While we do not find it necessary to make an extensive analysis of forfeiture law, there is no denying that Vollmer's chances of collecting the reward were at a minimum at least enhanced by convictions and we think it likely that he recognized that fact.[2] But we do not see why that matters for we agree with the court of appeals in *United States v. Hodge,* that "[t]he method of payment is properly a matter for the jury to consider in weighing the credibility of the informant." 594 F.2d at 1167. Indeed, we wonder how the law could be otherwise for many witnesses at both civil and criminal trials as, for example a plaintiff in a personal injury action,

---

**2.** The indictment made reference to 21 U.S.C. § 853 which provides for the forfeiture of certain property of persons convicted of particular offenses. On the other hand 21 U.S.C. § 881 provides for forfeiture of property involved or acquired in various ways in controlled substance offenses and is not conditioned on the conviction of any defendant.

testify with interests contingent on the outcome of a case. While we hasten to add that values different from those in civil cases underlie the due process claim advanced here, the general approach in litigation that the interest of a witness goes to credibility is instructive to us. Overall, we conclude that the use of Vollmer both to develop this case and as a witness at trial did not create a due process problem.

■ Gonzales also raises a sentencing issue, contending that the court erred in only allowing him a 2-level decrease under guidelines § 3B1.2 for being a minor participant in the criminal activity. He asserts that he should have been allowed a 4-level decrease as a minimal participant. We review this factual determination to ascertain if it was clearly erroneous. *See United States v. Hagan*, 913 F.2d 1278, 1283 (7th Cir.1990); *see also United States v. Ortiz*, 878 F.2d 125, 128 (3d Cir.1989). This point does not require extended discussion. Gonzales was a participant at the September 27, 1989, meeting. Furthermore, he drove the van to the meeting on October 4, 1989, and at the time of the arrest had in his possession documents which indicated that the van was owned by a female residing at his address, a circumstance from which it could be inferred that he obtained the vehicle for the trip. In fact, Gonzales's characterization as a minor participant may have been generous.[3] Thus, we reject his argument.

■ Ruiz first contends that "the United States Attorney did not act in good faith in refusing to request a [guidelines § 5K1.1] downward departure motion based on [his] cooperation, in violation of due process." He then makes the related argument that the district court "erred in not awarding a downward departure based on appellant's cooperation, despite the government's refusal to file a [guidelines

§ 5K1.1] motion." Guidelines § 5K1.1 provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." In *United States v. Bruno*, 897 F.2d 691 (3d Cir.1990), we held that the district court could not depart downward under guidelines § 5K1.1 "in the absence of a government motion based on defendant's cooperation." 897 F.2d at 696. Inasmuch as we did not create a requirement that the government act in good faith in refusing to request a downward departure, the exception to guidelines § 5K1.1 which Ruiz advances simply does not exist and thus we cannot hold that the government did not act in good faith in refusing to request the departure. Furthermore, we cannot hold that the court erred in not awarding a downwards departure as it was powerless to do so inasmuch as the government did not request the departure.[4]

We realize that in *Bruno* we indicated that the "district court was required to consider defendant's cooperation when sentencing within the guideline range, though it retained discretion as to whether to give effect to that cooperation." 897 F.2d at 693. But the district court knew that as well as it indicated that "I will consider the extent to which the defendant cooperated in connection with my sentencing within the guidelines, itself." It is clear, however, that the court did not think much of Ruiz's cooperation as it stated that "[i]n exercising my discretion, I am going to consider the facts as outlined by you concerning his talks with the government—I won't call them cooperation." Thus, the court in its exercise of discretion disregarded Ruiz's claim of cooperation as it sentenced him at the top of his range.[5]

---

3. There are other factors in the record supporting the conclusion that Gonzales was not a minimal participant but we see no need to set them forth.

4. We are deciding these guidelines § 5K1.1 issues by construction of the guidelines and we are therefore exercising plenary review. *United*

*States v. Nottingham*, 898 F.2d 390, 392 (3d Cir.1990).

5. Our holding that there is no exception to guidelines § 5K1.1 when the government does not act in good faith in refusing to move for downward departure is predicated on the facts of this case. Here the government never agreed to make a motion for a downward departure if

▮] Ruiz's final contention is that the "government failed to prove by a preponderance of the evidence that [he] was an organizer" and therefore the 2-level increase under guidelines § 3B1.1(c) was improper. We review the determination of the district court under the clearly erroneous standard. *United States v. Gonzales*, 918 F.2d 1129, 1139 (3d Cir.1990). After a careful review of the record we are satisfied that the contention is clearly without merit.

The judgments of conviction and sentence of July 5, 1990, will be affirmed.

Ruiz cooperated. Rather, Ruiz's alleged cooperation was tendered without the benefit of a plea agreement. Accordingly, *United States v. Khan*, 920 F.2d 1100 (2d Cir.1990), which suggests that there can be narrow judicial review if the government refuses to make a motion for downward departure contemplated by a plea agreement, is distinguishable from this case. Thus, any determination by us as to whether we will follow *Khan* will have to wait for another day. We also point out that predicated on the district court's comments, even if there had been a plea agreement providing for the government to move for a downward departure, it would not have acted in bad faith in not making the motion in this case.