UNITED STATES of America, ex rel., VUITTON ET FILS S.A., and Louis Vuitton S.A., Plaintiffs,

v.

KAREN BAGS, INC., Jade Handbag Co., Inc., Sol N. Klayminc and Jak Handbag Inc., Defendants and Alleged Criminal Contemnors,

and

Barry Dean Klayminc, Gerald J. Young, George Cariste, S.M.E., S.A., Crystal, S.A., David Rochman, Robert G. Pariseault, Esq. and Nathan Helfand, Additional Alleged Criminal Contemnors.

No. 83 Cr. Misc. 1, p. 22–CLB.

United States District Court,
S.D. New York.

Jan. 24, 1985.

J. Joseph Bainton, New York City, Specially Appointed, for U.S.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiffs.

William Weininger, Samuel & Weininger, New York City, for defendant Sol Klayminc.

James A. Cohen, Washington Square Legal Services, Inc., New York City, for defendant Barry Klayminc.

Leonard Comden, Wasserman, Comden & Casselman, Encino, Cal., for defendant Gerald Young.

Mitchell B. Craner, New York City, for defendant George Cariste.

Thomas Matarazzo, Brooklyn, N.Y., for defendant Nathan Helfand.

## MEMORANDUM AND ORDER

### [Post-Trial Motions]

BRIEANT, District Judge.

As is set forth more fully in this Court's Memorandum Decision and Order dated April 9, 1984, *United States v. Karen Bags, Inc.*, 592 F.Supp. 734 (S.D.N.Y.1984) (hereinafter "Prior Order"), familiarity with which is assumed, these criminal cases arise out of the sales of counterfeit Louis Vuitton products and the campaign waged by Vuitton et Fils S.A. ("Vuitton") to protect its trademark and profits. On July 22, 1982, Sol Klayminc was sentenced before Magistrate Bernikow in this district, for criminal contempt, a crime based on Sol Klayminc's continuing to sell, or offer for sale, counterfeits in violation of an injunction issued in December 1978. As part of the settlement agreement in an underlying civil action, *Vuitton et Fils S.A. v. Karen Bags, Inc., et al.* (78 Civ. 5863), Sol Klayminc, his wife Sylvia, his son Barry, and the family-owned corporate defendants agreed to entry of a permanent injunction, which was then issued on consent by Judge Lowe of this Court on July 30, 1982. Undeterred, Sol Klayminc again became a criminal defendant charged with disobeying the July 1982 injunction.

After conducting a civil investigation, and concluding that wrongdoing by the Klaymincs and others had continued (Affidavit of J. Joseph Bainton, Esq., sworn to March 30, 1983), attorneys for Vuitton sought permission to investigate and prosecute the defendants named herein for their allegedly criminal acts in violation of the July 1982 injunction. 18 U.S.C. § 401(3). On March 31, 1983, Judge Lasker granted attorney Bainton's application to be appointed Special Prosecutor. Rule 42(b), F.R.Crim.P. The criminal actions proceeded, step by step, to trial by jury.[1]

This Court conducted a nine-day trial which concluded on May 24, 1984. The trial jury returned verdicts of guilty against defendants Sol Klayminc, Barry Klayminc, Gerald Young, George Cariste, and Nathan Helfand. All these defendants now move the Court to set aside the verdicts, Rule 29(c), F.R.Crim.P., to dismiss the Order to Show Cause under which the United States initially accused the defendants of criminal contempt, and/or to order a new trial. Barry Klayminc and Nathan Helfand also move for a "due process" hearing. The Court will treat separately the various challenges to the convictions

---

**1.** It should be noted that the recently enacted Comprehensive Crime Control Act of 1984, P.L. No. 98–473 (October 12, 1984), makes intentional trafficking in counterfeit goods following its enactment, a crime punishable by fine and imprisonment up to five years. 18 U.S.C. § 2320.

obtained by the Government's Special Prosecutor.

*Due Process*

Barry Klayminc and other defendants who are deemed to have joined in his motion argue that the prosecution of these cases violated defendants' due process rights under the Fifth Amendment to the United States Constitution. The grounds for this argument include (1) erroneous appointment of Vuitton's private attorney as a special prosecutor; (2) outrageous conduct by government agents; (3) excessive and improperly supervised investigative techniques; and (4) "targeting" of defendants who were "urged" to violate the law. (Defendant Barry Klayminc's Memorandum of Law, filed August 3, 1984; Defendant Gerald Young's Memorandum of Law, filed August 1, 1984).

Many of defendants' due process claims were presented to the Court in pre-trial motions and have been addressed in the Court's Prior Order, 592 F.Supp. at 740–49. Nevertheless, counsel for Barry Klayminc has insisted by motion and by letters received as recently as December 10, 1984, that the "sting" operation conducted by the Special Prosecutor is marred by unconstitutional features.

█ Defendants' first contention, concerning the propriety of the appointment pursuant to Rule 42(b), F.R.Crim.P., is discussed fully in the Prior Order. The appointment was authorized under the principles enunciated in *Musidor B.V. v. Great American Screen*, 658 F.2d 60 (2d Cir. 1981), *cert. denied*, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982). Once the appointment was approved by Judge Lasker, and upheld as lawful in this Court's Prior Order, no purpose is served for defendant Klayminc to continue to state that "it was actually a private party that conducted the sting. The fact that it was a private party that conducted the operation and not the government, while it goes a long way toward explaining the shortcomings of the investigation, at the same time makes those short-comings [sic] more offensive and less tolerable." (Defendant Barry

Klayminc's Memorandum of Law, filed August 3, 1984 at 25). There is no merit to this argument. It was not a private party conducting the sting; it was a specially appointed prosecutor acting on behalf of the United States.

Contrary to defendants' view, this Court is not persuaded that any new information has been discovered at or after trial that impugns the integrity of the Special Prosecutor or highlights any alleged conflict of interest rendering the appointment invalid. Barry Klayminc points to tape-recorded conversations between the government agent (Mel Weinberg, of Abscam fame) and the defendants which display an "unseemly curiosity" regarding the defamation action filed by Sol Klayminc in state court against attorney Bainton. In addition Barry Klayminc points to similar conversations in which the pending bankruptcy concerning Debtor Sol Klayminc is discussed. These conversations, it is argued, reveal abuses by the Special Prosecutor who utilized the government investigation to advance his own interests and the interests of his private client, Vuitton.

Taken in proportion to the whole of the extensive tape recordings made during the sting, the conversations to which defendants object are no more and no less than portions of a continuing Runyonesque dialogue between the undercover agent and the defendants. There is no basis for inferring that Bainton was using the government investigation "to seek out and attempt to eliminate personal enemies." Records in the Supreme Court of the State of New York, County of New York reveal that although Sol Klayminc did begin a defamation action against Bainton (by serving a summons and complaint in December 1982), that action was never pursued in any fashion and was eventually closed by the filing of a stipulation of discontinuance in July 1984. The Court declines to find that the defamation suit would motivate the Special Prosecutor to engage in misconduct or that it did. *See* Prior Order, 592 F.Supp. at 746.

Likewise, the bankruptcy action in which Vuitton opposed the discharge of Sol Klayminc, did not create such a conflict of interest that would rise to the level of a due process violation. Simply because Vuitton's civil proceedings to recover damages and lost profits coincided with the criminal investigation does not require that the Special Prosecutor be disqualified. The taped conversations concerning the bankruptcy do not provide a basis for finding the "demonstrable level of outrageousness" of the sort discussed in *Hampton v. United States*, 425 U.S. 484, 495, n. 7, 96 S.Ct. 1646, 1653, n. 7, 48 L.Ed.2d 113 (1976) (Powell, J. concurring). Even assuming that the taped conversations did concern subjects not relevant to the purpose of the undercover operation, as did much of Weinberg's conversational play acting, the standards for reversing a conviction or for dismissal of the charging instrument require much more offensive instances of prosecutorial misconduct than are alleged here. *See Wright v. United States*, 732 F.2d 1048, 1055–58 (2d Cir.1984).

The remaining arguments underlying defendants' due process claim involve subjects somewhat related to prosecutorial conflict of interest. These arguments concern the propriety of the government agents' conduct and whether the agents acted without proper governmental supervision. Defendants contend that the unsupervised nature of the investigation resulted in ambiguous and unreliable evidence which was presented to the trier of fact.

One of the agents employed by the Special Prosecutor was Melvin Weinberg. Video and audio tapes of meetings and conversations between Weinberg and the various defendants formed the bulk of the government's evidence at trial. In his petition for a post-trial evidentiary hearing, defendant Barry Klayminc questions (1) the extent to which the government initiated rather than detected criminal activity; (2) the excessiveness of the sting; and (3) the lack of procedural safeguards in the investigative techniques. Barry Klayminc undoubtedly is correct when he states that: "But for the actions of Mel Weinberg, and those behind them, there would be no issue before the court today." The difficulty with defendant's position, however, is that he must distinguish between infiltration by an undercover agent which constitutes "effective law enforcement work," *United States v. Corcione*, 592 F.2d 111, 115 (2d Cir.), *cert. denied*, 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979), and governmental conduct which "creates a substantial risk that the 'guilty' verdict is not a reliable evaluation of what a defendant did." *United States v. Myers*, 527 F.Supp. 1206, 1229 (E.D.N.Y.1981), *aff'd in part*, 692 F.2d 823 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

■ It is indisputable that Mel Weinberg is a "con man," that he has a prior criminal record, and that he used his amazing skills at role playing, deception and trickery during the course of these undercover operations. Weinberg's unsavory past and his skills aforementioned do not disqualify him from employment as a government agent; in fact, they give Weinberg the ability to dissimulate and pretend convincingly, and to succeed at his role as an undercover informant or creator of a sting. *Myers*, 527 F.Supp. at 1239. The Court has reviewed trial transcripts as well as tape transcripts attached as exhibits to the parties' post-trial briefs and finds that none of Weinberg's conduct constitutes unconstitutional, outrageous government conduct of the sort that would justify setting aside a jury verdict on the ground that due process has been denied. Nor is Weinberg's credibility or lack thereof a serious issue in the case. In truth, defendants were for the most part convicted out of their own mouths, not Weinberg's.

Although a small number of convictions have been overturned on due process grounds relating to overinvolvement by government agents, *United States v. Lard*, 734 F.2d 1290 (8th Cir.1984); *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978); *Greene v. United States*, 454 F.2d 783 (9th Cir.1971); *United States v. Valdovinos-Valdovinas*, No. CR–83–0711, slip op. (N.D.

Cal. Feb. 15, 1984), *rev'd on other grounds,* 743 F.2d 1436 (9th Cir.1984), and although the Supreme Court has suggested that due process standards might bar convictions in a case of intolerable, outrageous government conduct, *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), far more frequently convictions have been upheld despite arguments from the defendants that their due process rights were violated by outrageous government conduct. *See e.g., United States v. Myers, supra; United States v. Duggan,* 743 F.2d 59 (2d Cir.1984); *United States v. Dyman,* 739 F.2d 762 (2d Cir.1984); *United States v. Toner,* 728 F.2d 115 (2d Cir.1984); *United States v. Silvestri,* 719 F.2d 577 (2d Cir.1983) (Abscam); *United States v. Romano,* 706 F.2d 370 (2d Cir.1983); *United States v. Williams,* 705 F.2d 603 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983) (Abscam); *United States v. Carpentier,* 689 F.2d 21 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983) (Abscam); *United States v. Alexandro,* 675 F.2d 34 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982) (Abscam); *Archer v. Commissioner of Correction of the State of New York,* 646 F.2d 44 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981); *United States v. Nunez-Rios,* 622 F.2d 1093 (2d Cir.1980); *United States v. Corcione,* 592 F.2d 111 (2d Cir.), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979).

■ Whether the instant convictions must be overturned depends on the facts and the degree of outrageousness. In the case at bar, Weinberg did "string along" the defendants through the use of lies and false pretenses, money and similar encouragement. It is permissible for agents to infiltrate and participate in illegal enterprises for the purpose of obtaining evidence, *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), and the agents' conduct is not outrageous "merely because the agents did not cease their efforts immediately upon [defendant's] initial proclamation of honesty." *Myers,* 527 F.Supp. at 1231. According to the dissent in *Hampton,* intolerable outrageousness, either on a due process or some other theory, would be reached where the "Government's agent deliberately sets up the accused by supplying him with contraband and then bringing him to another agent as a potential purchaser ..." of that contraband, thereby in effect creating the crime. 425 U.S. at 498, 96 S.Ct. at 1654 (Brennan, J., dissenting). The instant case did not involve that sort of outrageousness. Weinberg did not supply counterfeits.

■ Furthermore, whatever claim of constitutional violation may have been founded upon Weinberg's statements that the Vuitton counterfeits to be made in the Republic of Haiti were not going to be sold in the United States and that it was not a crime to manufacture the Vuitton trademarked goods outside of the territorial United States was cured by the Court's charge to the jury. As an abstract matter, the extra-territorial manufacture and distribution of the counterfeits by Sol Klayminc, or aiding and abetting him to do so, would violate the July 1982 injunction. *See Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952); *Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). However, in the interests of fairness, and because Weinberg, posing as Mel West, had told Sol Klayminc that such conduct would be legal, this Court instructed the jury that:

"Before you may conclude that a defendant whose case you are considering undertook some act in violation of the injunction, you must find that in addition to satisfying its burden of proof as to the elements of contempt that I have already discussed, the government has also proved beyond a reasonable doubt that it was intended that the offering or the manufacture, assembly, sale or other distribution of counterfeit handbags either did take place or was to take place wholly or partly in the United States.

Much of the evidence presented in this trial has concerned activities that occurred or are alleged to have occurred in Haiti. I instruct you that the manufacture of counterfeit handbags in Haiti and the sale or distribution of those handbags in Haiti or Europe or anywhere else in the world entirely outside of the United States would not violate the injunction. So if you find that a plan or scheme for the manufacture and sale of counterfeit Vuitton bags existed but that those activities were to be conducted only outside the United States, with the sale or other distribution of counterfeit bags taking place only outside the United States, you may not find that any act in furtherance of that scheme violated this Court's order. Accordingly, any defendant who participated in a plan or scheme and did some activity in furtherance of it to sell or otherwise distribute or manufacture entirely outside the United States would not be in contempt of the injunction and such a person should be found not guilty.

However, if you find that it was understood and intended by the person whose case you are then considering that counterfeit handbags would be distributed or sold either wholly or partly in the United States and that the defendant whose case you are then considering undertook some overt act in furtherance of the plan to manufacture or distribute fake handbags in the United States, then you may find that that defendant violated the Court's injunctive order. In other words, members of the jury, in order to find a defendant guilty of contempt you must find beyond a reasonable doubt either that he participated in or aided and abetted a violation of the injunction here in the United States or in a scheme to manufacture or distribute counterfeit handbags made in Haiti to be sold, imported, distributed, either wholly or partly, within the United States." (Trial Transcript, pp. 962–64).

We believe that this instruction neutralized any prejudice suffered by any defendant who may have relied on the aforementioned advice on the part of Weinberg which we assume for the argument may be characterized as outrageous. This instruction assured that the jury based its verdict upon reliable evidence of commission of the crime of contempt in the United States, and not in Haiti.

Finally, no matter what Melvin Weinberg did or did not say or do, he could not force Sol Klayminc to bring twenty-five counterfeit Vuitton bags to the Plaza Hotel in New York City, as he did, and exchange them for Six Hundred Twenty-five Dollars in cash, as he did. (Tape 6A, April 5, 1983). This was as clear an example of a criminal contempt as could be imagined.

■ In the same vein, the Court finds that the evidence received by the jury was not rendered unreliable due to any governmental misconduct. The defendants argue that the investigation produced ambiguous evidence, especially on the issue of intent, and that these ambiguities by their very existence transgress due process limits. To the extent this argument addresses the weight or reliability of evidence, it presents a jury question. The jury viewed and heard taped meetings between Weinberg and defendants, some more than once. This does much to negate claims that the events and evidence were ambiguous. The video and audio tapes speak for themselves, and vividly. They are more reliable than testimony by any eye witness who attempts to recreate an event after it has occurred. *Myers*, 527 F.Supp. at 1229–30. During the taped conversations, it was permissible for the government's agent to simulate the guarded conversations that are generally expected in proposals by the minions of organized crime to engage others to assist in unlawful activities. *Myers*, 692 F.2d at 843–44. Furthermore, the issue of intent always requires the jury to draw inferences and to make decisions about the meaning of a person's words and conduct. The strength of the overwhelming evidence in this case obviates any apprehension that the government's investigation created the

risk that the jury verdicts were not based upon reliable fact-finding.

For example, Sol Klayminc's own statements form a basis for inferring that he knew that further counterfeiting would constitute a crime:

> SOL KLAYMINC: "Okay now, I need to protect myself against these people [Vuitton] because you know I had a to-do with them several times. I got to make sure that I don't expose myself to them again because it would be a criminal action." (Tape 6A, April 5, 1983).

> \* \* \* \* \* \*

And he did it anyway:

> WEINBERG: "Order the LV's, just the LV's [Vuitton goods]. The hell with this other for a while. Let's get them out. SOL KLAYMINC: ... All right. So now I spoke to this guy George and I gave him the order to start, three hundred satchels and a hundred shopping bags and a hundred cosmetic cases." (Tape 6B, April 5, 1983).

The operations of George [Cariste] were located in the United States and so known to be by Sol Klayminc at the time. Additionally, Sol Klayminc's own statements form an adequate basis to support the jury's finding that Sol Klayminc intended to distribute counterfeit Vuitton products within the territorial United States:

> WEINBERG: "How long do you think that the L.V.'s will still be popular in this country?
> SOL KLAYMINC: It could be good for another five years....

> \* \* \* \* \* \*

> SOL KLAYMINC: Yeah, there's a big market out there, a tremendous market. (Tape 1, April 1, 1983).

> \* \* \* \* \* \*

> WEINBERG: We'll bring it in with our planes. There'll be no Customs or nothing.
> SOL KLAYMINC: Wow, that's great." (Tape 2, April 4, 1983).

Furthermore, the jury was entitled to believe Weinberg's trial testimony:

(Cross-examination by Mr. Weininger, Attorney for Sol Klayminc).

> "Q [Mr. Weininger]: And that had nothing to do with Klayminc's operation in Haiti?
> A [Mel Weinberg]: Sure it did. The bags are supposed to come into the states." (Trial Tr. p. 201).

The government introduced similar evidence of joint activity among the defendants. Without providing further examples of relevant evidence, a subject more fully discussed below in the Court's treatment of defendants' challenges to the sufficiency of the evidence, the Court finds that there was no impairment of accurate fact-finding, and that none of the challenged convictions should be set aside on the ground that defendants' constitutional rights were denied by reason of a faulty or poorly supervised government sting operation.

■ Turning to the motions for a post-trial evidentiary hearing, the Court concludes that this request also should be denied. The demand for a hearing is based upon the following theories and offers of proof: (1) that the 45 minute gap occurring on a tape recording of April 21, 1983 raises a strong inference of tampering by the government; (2) that the CBS Sixty Minutes program entitled "Sting Man Stings Again" and aired on October 21, 1984 provides new information concerning threats made by the government agent; (3) that defendant Nathan Helfand's testimony at such a hearing would establish that Weinberg was the one who initially asked Helfand whether he knew Sol Klayminc and that this testimony would establish improper targeting; and, in general (4) that defendants are in need of another opportunity to present evidence of outrageous government conduct.

Even if such a hearing were held, and defendants were able to prove these contentions, the Court is unable to conclude that these specific events mentioned would violate constitutional due process standards.

According to a letter from James A. Cohen, attorney for Barry Klayminc, dated November 12, 1984, a due process hearing is necessary in order to give the Special Prosecutor an opportunity to explain the condition of the blank video tape which was introduced into evidence at trial (Gov't. Ex. 109). The blank video tape was an attempted recording of an April 19, 1983 meeting at the Plaza Hotel attended by Barry Klayminc, George Cariste and Melvin Weinberg. As part of defendant Barry Klayminc's post-trial requests, granted by this Court at the hearing of October 5, 1984, Mr. Cohen deposed the operator of the video equipment, Sgt. Michael Harvey, who is a California law enforcement officer. The Court has reviewed the typed transcript of this telephone conference call deposition. The transcript establishes that the technical supervisor, Sgt. Harvey, has no explanation for the failure of the recording device. From this fact, counsel for Barry Klayminc leaps to the conclusion that the Special Prosecutor must have tampered with the tape while the tape was in his custody:

> "From our conversation with Mr. Harvey, it is clear that the problem did not occur at the time of the recording, since the tape has been (presumably) in the exclusive possession of the prosecutor or his agents; an inference that the agents/government tampered with the tape is irresistable. Since the inference raised is so strong, and since the due process concerns involving both the quality and method of the prosecution's investigation and the possible withholding of *Brady* material available on the tape are currently before the court, a hearing should be held to develop this issue i.e., the special prosecutor should be given an opportunity to explain the condition of the tape." (Letter of James A. Cohen, dated November 12, 1984).

It is unclear what evidence Mr. Cohen would expect to uncover at an evidentiary hearing on the subject of the blank video tape. The tape operator has already been deposed; the Special Prosecutor has already stated his position that the government knows of no explanation for the failure of the recording. (Hearing Transcript, October 5, 1984, p. 34; letter of J. Joseph Bainton, Esq., dated November 29, 1984). The trial jury was aware that the tape equipment had failed (Trial Tr., pp. 172–73, 465–71) and could have chosen to disbelieve Melvin Weinberg's uncorroborated account of the meeting. Finally, it is unclear how the tape could have contained undisclosed *Brady* material since the defendant himself was present at the meeting which the government attempted to videotape. *See United States v. Robinson*, 560 F.2d 507, 518 (2d Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

■ Defendant Barry Klayminc has not referred to any unrecorded portions of the conversation with Weinberg that would have added to his defense. The tape equipment failure, in short, does not support an inference of due process violations on the part of the prosecution, and no hearing is necessary to elicit repetitious statements by the Special Prosecutor or Sgt. Harvey. These insinuations do not amount to sufficient evidence of tampering, to trigger a hearing. There is no duty to make recordings of criminal activity. *United States v. Weisz*, 718 F.2d 413, 435–37 (D.C.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688 (1984).

Turning to the alleged new information revealed during the Sixty Minutes television interview with Melvin Weinberg, defendants' due process theory here too fails to necessitate an additional evidentiary hearing. The so-called new information is not very new. It is the revelation that Weinberg made threats to Barry Klayminc during the course of the "sting" operation. On Sixty Minutes, Weinberg and Mike Wallace, host and interviewer, engaged in the following dialogue:

> "MR. WALLACE: Well, why did you make a death threat to Barry Klayminc?
>
> MR. WEINBERG: I made—I didn't believe it was actually a death threat. I told him I'd break his head open if he keeps starting rumors.

MR. WALLACE: You didn't say to him, 'You wouldn't want your parents to have only one child left?'—and he had a sister. MR. WEINBERG: I may have said that to him there. I was trying to tell him to get off our back, 'cause he was going up telling the father we weren't for real.' (Transcript of CBS News, October 21, 1984, p. 11, annexed to Gov't Memorandum in Opposition, dated November 29, 1984).

At trial, Weinberg testified (Cross-examination by Mr. Cohen):

"Q: Did you ever say 'I will cut the cocksuckers throat, he will have a real scar?'

A: If it is in the tape, I said it.

\* \* \* \* \* \*

Q: Did you ever say, 'Yeah, I got it out of the kid, and I said next time you open your fuckin' mouth is going to be the last time?'

A: If it is on the tape, I said it." (Trial Tr. pp. 344–46).

Upon a comparison of Weinberg's post-trial statements to a CBS journalist, and the statements Weinberg made on tapes introduced at trial, as well as his cross-examination testimony quoted above, the Court cannot find that the more recently admitted threats are different in degree or content from the threats exposed during trial. While the Court does not applaud the fact that undercover agents, if convincing, must "do and say things that are generally deplored in more civilized parts of our society," *United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980), the fact remains that an undercover agent often is playing the role of a hood, a criminal, a person with a reputation for violence and deceit. It is possible for a defendant to build a successful defense of entrapment or duress based upon such an agent's threatening and despicable conduct; however, the instant request is different, and not based on entrapment or duress. As is made clear by Mr. Cohen's letter dated December 10, 1984, defendant Barry Klayminc's motion is based upon the theory that Weinberg's total conduct, including his "death threats," was so outrageous that the Court should find as a matter of law that the defendant suffered denial of his constitutional right to due process. This the Court declines to do.

Mr. Weinberg's "threats," considered separately or in context with his role as a self-proclaimed gangster, are not instances of actual coercion which left Barry or Sol Klayminc with no alternative but to continue participating in the criminal enterprise. Neither Weinberg's threats nor the Special Prosecutor's knowledge of Weinberg's tactics create the kind of government involvement that shocks our universal sense of justice, *Kinsella v. United States*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960), or the kind of conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).

It is the Supreme Court's opinion in *Russell* and the separate opinions in *Hampton* that provide the foundation for defendants' due process theory for post-trial relief. Those opinions discussed the distinction between the due process claim and the entrapment claim, and, in *Russell*, the Court stated that the entrapment claim is not of constitutional dimension. 411 U.S. at 433, 93 S.Ct. at 1643. In view of the fact that the trial jury was instructed on the issue of entrapment (Trial Tr. pp. 967–71) and chose to convict the defendants despite their assertions, it would be error for the Court to permit the factual issue of entrapment to re-emerge following the jury verdict, restated as a constitutional due process argument entitled to succeed as a matter of law. The jury has already considered the interactions among Weinberg and the various contemnors, and the possibility that the defendants had no previous intent to violate the law but were victims of entrapment. A successful post-trial due process challenge would have to be based upon facts other than those essential to the en-

trapment claim, already rejected by our jury, and none have been presented.

As to the proffered testimony by defendant Nathan Helfand, even if it were established that during Weinberg's fourth meeting with Mr. Helfand, Weinberg asked Helfand whether he knew Sol Klayminc and requested Helfand to contact Sol Klayminc (Joint Letter of James A. Cohen, Esq. and Thomas Matarazzo, Esq. dated November 28, 1984), this fact does not "clearly demonstrate that the Klaymincs were improperly targeted." (*Id.*).

The *Myers* district court addressed the issue of targeting in the Abscam "stings" and concluded that the prosecution needed no "probable cause" or even "reasonable suspicion" as a constitutional predicate to offering bribes to the defendant congressmen. 527 F.Supp. at 1226; *accord, United States v. Myers*, 635 F.2d 932, 940–41 (2d Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). *A fortiori*, it can be no different for a handbag manufacturer with one prior conviction. The proffered testimony does not necessitate a due process hearing.

*Sufficiency of the Evidence*

■ Defendants Sol Klayminc, Barry Klayminc, George Cariste, Nathan Helfand and Gerald Young have moved for a judgment of acquittal pursuant to Rule 29(c), F.R.Crim.P. The memoranda in support of these motions focus upon different aspects of the evidence, but, in general, they assert that the government failed in its proof.

"The standard to be applied by a trial court confronted with a motion for a judgment of acquittal was set forth in *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972), quoting *Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

'The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. (footnotes omitted).'

Furthermore, '[i]t is axiomatic on motion for acquittal that all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense.' *United States v. Skinner*, 138 U.S.App. D.C. 121, 123, 425 F.2d 552, 554 (D.C.Cir. 1970)."

*United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.1980), *cert. denied*, 449 U.S. 879, 101 S.Ct. 226, 66 L.Ed.2d 102 (1981). It is axiomati furthermore that the trial judge cannot substitute his judgment for that of the jury, and is not "entitled to set aside the guilty verdict simply because he would have reached a different result if he had been the fact-finder." *United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir. 1983), *cert. denied* — U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984).

■ Applying these principles to Sol Klayminc, his Rule 29 motion must be denied. It is indisputable that Sol Klayminc had knowledge of the 1982 injunction since he consented to its entry. It is indisputable that Sol Klayminc had awareness of the criminal nature of acts violating the 1982 injunction since he had already been convicted of criminal contempt before Magistrate Bernikow of this Court. As to the

requisite criminal intent, counsel for Sol Klayminc argues that Sol repeatedly expressed his desire to avoid any plans involving manufacture or distribution of Vuitton bags in the United States, and that these expressions negate the jury finding of guilty intent to violate the terms of the injunction. (Notice of Motion, dated August 3, 1984, pp. 4–14). In an effort to counter the evidence that Sol Klayminc sold 25 bags to Mel Weinberg at the Plaza Hotel in New York City, counsel for Sol Klayminc asks the Court "to view this exchange in the context of what the Prosecution knew about Mr. Klayminc's state of mind, that is his concern about not violating the Court Order." (*Id.* at 14).

The Court is certain that Sol Klayminc must have been "concerned" about not violating the injunction. However, his "concern" changes neither what he said and did, nor the reasonable inferences to be drawn therefrom. The Court cannot find that "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Taylor, supra.*

The jury heard Sol Klayminc on audiotape exchange 25 counterfeit bags for cash within the territorial United States, evidence that was corroborated copiously by other recordings in which Sol Klayminc provided the jury with reasons to find that he intended that the counterfeits be offered for sale within the United States. Two samples are illustrative:

"MR. MEL WEINBERG: All right? That these guys know they're dealing with me, to give us the material.

MR. SOL N. KLAYMINC: Oh yeah. Yeah.

MR. MEL WEINBERG: And then your son could stay in Haiti with you. I don't want you to come back to the States. You run your business. We'll take care of everything else here.

MR. SOL N. KLAYMINC: Okay, fine.

MR. MEL WEINBERG: We'll bring it in with our planes. We'll pick it up directly from him.

MR. SOL N. KLAYMINC: Beautiful.

MR. MEL WEINBERG: Bring it in with our planes. There'll be no Customs or nothing.

(Tape 2, April 4, 1983).

\* \* \* \* \* \*

MR. SOL KLAYMINC: Yeah, Okay, now what's happening with the L's [Louis Vuitton's] now. You—we're going ahead with the 500. Now, I was speaking to Nat [Nathan Helfand], he said you wanted 2,500.

MR. MEL WEINBERG: No, no. I—I got—I need 5,000 L's.

MR. SOL KLAYMINC: L's?

MR. MEL WEINBERG: Yeah.

MR. SOL N. KLAYMINC: How long do you want to give me?

MR. MEL WEINBERG: Well …

MR. SOL N. KLAYMINC: You give me by the end of the month I'll get it for you.

MR. MEL WEINBERG: By the end of the month?

MR. SOL N. KLAYMINC: Well, it'll—if you get half in the next couple of weeks, will that hold you off for awhile?

MR. MEL WEINBERG: Well, how many can George [Cariste] come up with?

MR. SOL N. KLAYMINC: I want George to cut for me and send it to Haiti. I could start making them there. He'll make half, I'll make half. Between the two of us we could knock you off the five [thousand] within a month.

\* \* \* \* \* \*

MR. SOL N. KLAYMINC: And then the fact that we send back legitimate stuff, I'll be making legitimate stuff, so that could go back in lieu. Now, we're going to send it through our name, my name.

MR. MEL WEINBERG: Right.

MR. SOL N. KLAYMINC: So now the other stuff I'll make and I'll send back and that'll be like, you know, the Customs I don't think they check what kind of stuff that you're sending.

MR. MEL WEINBERG: No, they don't check.

MR. SOL N. KLAYMINC: Right. So this way I send back legitimate goods and it covers the shipment."

(Tape 19, April 9, 1983).

These and other tape recordings, along with the trial testimony, amply support the jury verdict against Sol Klayminc. In addition, Government's Ex. 169, a written sales proposal by Helfand and Sol Klayminc to Mel West (Mel Weinberg's alias) contained reference to deliveries of fake Vuitton goods in New York or New Jersey. Sol Klayminc's actions—selling the twenty-five bags at the Plaza Hotel, agreeing to manufacture fake Vuitton bags at his factory in Haiti for shipment to the United States, accepting money from Weinberg to purchase machinery, engaging in numerous meetings and conversations to further the manufacturing and distribution scheme, introducing Weinberg to Gerald Young in order to obtain counterfeit Vuitton-like fabric—each of these acts could have supported the jury's conclusion that Sol Klayminc wilfully and intentionally disobeyed the 1982 court order by offering counterfeit Vuitton merchandise for sale in the United States.

The guilty verdicts against the four other contemnors also withstand their Rule 29 motions. Cariste, Helfand, Young and Barry Klayminc were tried and convicted on the theory that they knowingly and wilfully aided and abetted Sol Klayminc's commission of the substantive offense of criminal contempt. 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal"). The elements necessary to prove aiding and abetting are "the commission of the underlying offense by someone, a voluntary act or omission, and a specific intent that such act or omission promote the success of the underlying criminal offense." *United States v. Perry*, 643 F.2d 38, 46 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981).

The standard of proof as articulated by Judge Learned Hand, *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938), and currently applied in this Circuit, *United States v. Clemente*, 640 F.2d 1069, 1079 (2d Cir.1981), demands that a defendant must "in some sort associate himself with the venture ... participate in it as something that he wishes to bring about, [and] seek by his action to make it succeed." As explained in *United States v. Beck*, 615 F.2d 441 (7th Cir.1980), the standard for aiding and abetting has two prongs—association and participation; that is, intent plus some overt act designed to aid in the success of the venture.

In contending that the government's proof failed to satisfy these legal standards, defendant Nathan Helfand argues that there was inadequate evidence to establish that Helfand had knowledge of the existence of the permanent injunction. Helfand need not have been served personally with a copy of the injunction in order to have had "knowledge" of what the order prohibited. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129 (2d Cir. 1979); Rule 65(d), F.R.Civ.P. (an injunction is binding upon those persons ... "who receive actual notice of the order by personal service *or otherwise*") (emphasis added).

The evidence on this point included testimony by David Rochman that he received a telephone call from Helfand during the *first week of April, 1983*. Rochman testified that during this phone call, Helfand stated that he was involved with a large organization, together with Sol Klayminc who was "a very knowledgeable man in the business [counterfeiting], that he'd been doing this kind of thing for many years, that he had some problems with the Vuitton people, had been sued a few times *and was under an injunction now*." (Trial Tr. 503–04). The jury also heard evidence that Helfand and Sol Klayminc had known one another for a long time. This is an adequate basis for the jury to conclude that Helfand acted with knowledge of the 1982 injunction. As for overt acts, it was Helfand who helped to arrange the April 5, 1983 meeting between Sol Klayminc and

Melvin Weinberg at the Plaza Hotel. This act took place simultaneously with or immediately after Helfand's statement to Rochman that he knew about the injunction. Nor did Helfand drop out of the planning activities after the first week of April. Weinberg testified that "Helfand was calling me approximately every day" during the middle of April, 1983. (Trial Tr. 117–18). There was sufficient evidence to prove that Helfand was not a passive bystander, but rather, an active participant in the substantive commission of knowing and wilful violations of the 1982 injunction.

■ Similarly, defendants George Cariste and Gerald Young voluntarily associated themselves with Sol Klayminc with the specific intent to aid in the success of the manufacturing and distribution scheme. Cariste himself supplied the twenty-five counterfeit bags to Sol Klayminc for the April 5, 1983 sale at the Plaza Hotel. Cariste testified at trial that he had no actual knowledge of the injunction at the time that he dealt in the counterfeits. Apparently the jury disbelieved him. That does not create grounds for a judgment of acquittal under the exacting standard of "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

The jury heard evidence that Cariste had known Sol Klayminc in 1982 when Karen Bags, Inc. went out of business and that Cariste obtained Sol Klayminc's dies used in manufacturing counterfeit Vuittons. The jury also heard David Rochman testify that Cariste told Rochman on April 12, 1983 that he knew about Sol Klayminc's "problems with an injunction." (Trial Tr. 507). During April, 1983, and after April 12, 1983, George Cariste committed several overt acts from which the jury could conclude that he specifically intended to promote the venture, including his attendance and participation at the meeting of April 19, 1983 at the Plaza Hotel with Barry Klayminc, Gunnar Askelund (a Vuitton undercover investigator) and Mel Weinberg. Cariste testified that before this meeting he had delivered fifty counterfeit Vuitton

bags to a location in New York City, knowing that the bags were for use in Sol Klayminc's Haitian factory. He also testified that he went to the April 19, 1983 meeting which was set up because "Mel" was looking for a manufacturer of fake Vuittons in the United States. (Trial Tr. 684–86). Clearly the jury could find that George Cariste had knowledge of the injunction and nevertheless chose to participate actively in the offer for sale of counterfeit Louis Vuitton products.

Contemnor Gerald Young was videotaped on April 14, 1983 at a meeting at the Beverly Wilshire Hotel in Los Angeles. On the videotape, received in evidence and played for the jury, Young promises Mel Weinberg that he will supply counterfeit Vuitton fabric. The fabric was to be produced in Japan and then delivered in the United States *via* Young's contact in Hong Kong. The fabric would be in a roll having ten yards or so of "innocuous" fabric at its tail, so as to conceal the imitation Vuitton material. In addition, Young made arrangements to meet Gunnar Askelund at a California bank in order to open a joint account for funds to be used in obtaining the fabric. Young and Askelund signed bank signature cards for this purpose.

■ The jury fairly could have concluded that these and other overt acts were committed by Young while he had knowledge of the 1982 injunction. The government established, through credible evidence, that Young and Sol Klayminc had a longstanding relationship; and, again, Young's own statements revealed an awareness of the court order.

"MR. GERALD YOUNG: I understand what you're saying.
MR. MEL WEINBERG: This guy has got a million dollars worth of troubles.
MR. GERALD YOUNG: Sol?
MR. MEL WEINBERG: Yeah.
MR. GERALD YOUNG: He got two million dollars worth. If he would have listened to me, he wouldn't have had those troubles.
MR. MEL WEINBERG: Hey, second guessing—

MR. GERALD YOUNG: Yeah. Hindsight is 20/20, right?

MR. MEL WEINBERG: I mean the guy—the guy got caught." (Tape 2, April 14, 1983).

Taken in view of the totality of the evidence, the jury could have found this and other statements to be a valid basis for inferring knowledge and wilfullness on the part of Young.

Because Barry Klayminc, like Sol Klayminc, consented to the entry of the 1982 injunction, there can be no doubt that he was aware of the prohibition against dealing in counterfeit Vuitton goods. It was stipulated at trial that knowledge is not a disputed issue in the case against Barry Klayminc. Instead, this defendant bases his Rule 29 motion largely on the argument that the evidence failed to prove a volitional, completed act by Barry Klayminc which would constitute criminal contempt. Defendant argues that Barry's role was limited to "discussions" about the bag scheme, and that Barry's statements either concerned past acts or were expressions of future intent. If this were true, the Court would find that the second prong of the test for aiding and abetting had not been satisfied and that the verdict could not stand because the jury could not have found the requisite participation by Barry. However, the facts in evidence support the jury's conclusion that Barry did more than just talk.

The most significant act by Barry Klayminc in furtherance of an intentional plan to offer counterfeit bags for sale in the United States was his attendance at an April 19, 1983 meeting at the Plaza Hotel with Mel Weinberg and George Cariste. Cariste testified that Barry had telephoned Cariste to arrange the meeting. (Trial Tr. 684–85). Barry met George Cariste in the lobby of Barry's apartment building and then escorted him to the hotel and called the room registered to "Mel West." After having several drinks in the hotel bar, Barry and Cariste went upstairs where Barry introduced Cariste to Weinberg. (Trial Tr. 169–73, 686–89). Later Barry telephoned Cariste to request that he cut patterns for the Vuitton dies. (Trial Tr. 692).

In addition the jury heard taped conversations between Barry and Weinberg. In one such conversation, Barry refers to a trip to New Jersey to make a "pick-up" from Cariste:

"MR. BARRY KLAYMINC: He also mentioned to me that, you know, when we want to make that pickup that I'll go along with your men or whatever, you know, with the—

MR. MEL WEINBERG: Oh, yeah, that's what I want to go over with you. All right.

MR. BARRY KLAYMINC: Yeah, no problem with that.

MR. MEL WEINBERG: All right, well, then we go to George's and make the pickup, all right?

MR. BARRY KLAYMINC: Right.

MR. MEL WEINBERG: He knows I would go with you. I'll send one of my drivers with the cash.

MR. BARRY KLAYMINC: Okay. No problem.

MR. MEL WEINBERG: Well, probably it's for your protection too.

MR. BARRY KLAYMINC: Right.

MR. MEL WEINBERG: All right? And then they'll take it and they'll go right to the plane. We'll have a plane at the airport.

MR. BARRY KLAYMINC: Fine. No problem.

MR. MEL WEINBERG: All right? Where? We got to go to Jersey?

MR. BARRY KLAYMINC: Yeah, yeah, he's out in Jersey. I don't have his address here. I'll get that from my father.

MR. MEL WEINBERG: Oh. I mean, is the place a safe place, though?

MR. BARRY KLAYMINC: What's that?

MR. MEL WEINBERG: Well, where they're going, is it a safe place? To his house or factory, or what?

MR. BARRY KLAYMINC: I'm pretty sure, you know, it's a factory, but as far as I know' it's safe. I mean' there's never been any screw-ups before' so—

MR. MEL WEINBERG: All right—

MR. BARRY KLAYMINC: —you know—

MR. MEL WEINBERG: —that's all. I don't want to get you involved with it' you know.

MR. BARRY KLAYMINC: No, there won't be any trouble. I, mean, you know, this guy's, you know' he's a good man, and you know, there really won't be any problem." (Tape 30, April 12, 1983).

In another conversation, Barry discusses the possibility of manufacturing counterfeit Vuitton goods inside the territorial United States. It will be remembered that the "LV" mark is imprinted directly in the fabric itself, so that merely producing the material is itself an act of infringement:

"MR. MEL WEINBERG: We may be able to buy, we're working on a deal to buy a factory to produce our own material.

MR. BARRY KLAYMINC: Oh really?

MR. MEL WEINBERG: Yeah.

MR. BARRY KLAYMINC: That would be, that would be super.

\*   \*   \*   \*   \*   \*

MR. MEL WEINBERG: So, we should be and we may buy another factory up in the, in the states.

MR. BARRY KLAYMINC: Right.

MR. MEL WEINBERG: And if we do, one of the things we're going to do is put you in to help run it.

MR. BARRY KLAYMINC: Okay, I, you mean to produce the product or just the fabric?

MR. MEL WEINBERG: No, no. We got, we'll have the fabric produced, all right?

MR. BARRY KLAYMINC: Right.

MR. MEL WEINBERG: And then to produce the product, we'll put you in 'cause you know the L.V.'s and all. Now, pop says George has got the dies for, of his?

MR. BARRY KLAYMINC: Yeah, he should have just about all the dies.

MR. MEL WEINBERG: But George has got 'em?

MR. BARRY KLAYMINC: Yeah." (Tape 40, April 17, 1983).

In yet another taped dialogue, Barry Klayminc told Weinberg about his intimate familiarity with the counterfeiting business, and assured Weinberg that he could take over for Sol Klayminc in the event that Sol became unable to manage the Haitian factory:

"MR. MEL WEINBERG: Any of the stuff for the Louis Vuitton there?

MR. BARRY KLAYMINC: What?

MR. MEL WEINBERG: Any of the stuff for the pocketbooks—?

MR. BARRY KLAYMINC: Well, the machinery, of course, will be used for that, but the leather is that softer leather, you know, we used, you know, for those other bags. But you know, the other machinery we definitely can use, you know, for the L. [Louis Vuitton] program.

MR. MEL WEINBERG: All right, now, long as I got you one the phone, all right—?

MR. BARRY KLAYMINC: Yeah.

MR. MEL WEINBERG: —you're going to be working for Pop, right?

MR. BARRY KLAYMINC: Yeah, sure.

MR. MEL WEINBERG: All right, what is your capacity? You know, we get to know each other.

MR. BARRY KLAYMINC: As far as what?

MR. MEL WEINBERG: Well, what did you do before for Pop?

MR. BARRY KLAYMINC: Oh well, like, everything from fixing machines to working with the biggest buyers, I mean, you know, selling-wise. I mean, I ran the whole gamut. I started out, you know, literally sweeping the floors, and you know, I was—you know, supervised, worked on machines, fixed machines, went out selling—you know, the whole deal. So there's no part of the business I don't know—put it that way.

MR. MEL WEINBERG: Now, are you able to take over for us and make the L's [Louis Vuitton's] down in Haiti?

MR. BARRY KLAYMINC: Oh, no problem.

MR. MEL WEINBERG: All right, and you know all about how to make 'em?

MR. BARRY KLAYMINC: Oh, yeah.

MR. MEL WEINBERG: And you did it up here?

MR. BARRY KLAYMINC: Oh, yeah.

MR. MEL WEINBERG: Oh, you did it up here, so you know about 'em.

MR. BARRY KLAYMINC: Yeah, no problem.

MR. MEL WEINBERG: All right, 'cause I didn't know that you did it up here or not.

MR. BARRY KLAYMINC: In fact, you know, comes out I'll look forward to doing the cutting and stuff on that, 'cause you know I used to get a little enjoyment out of, you know, getting the best, you know, out of it that you could, you know, the best yield, if you know what I'm saying, and oh yeah, you know, I mean, I'm definitely fully versed on, you know, the whole operation and, you know, how everything goes.

\*　　\*　　\*　　\*　　\*　　\*

MR. MEL WEINBERG: —I'd like to meet you. But I mean, what I'm worried about is that anything happens to Pop, you know what to do, where to order, get the stuff, and—

MR. BARRY KLAYMINC: Right. Oh, no, no, I mean, you know, God forbid, of course, if that would ever happen, I mean, I'd fill right in, and I mean, I'd jump right in. I mean, I'm—you know, you're not talking to a greenhorn here.

MR. MEL WEINBERG: All right, you know, I mean, the main thing is that you know how to make the L's [Louis Vuittons] that you did before.

MR. BARRY KLAYMINC: Yeah, definitely, definitely." (Tape 30, April 12, 1983).

■ Mindful of the requirement that the evidence be weighed as a whole rather than as individual facts in isolation, *United States v. Wright*, 588 F.2d 31, 34 (2d Cir.1978), *cert. denied*, 440 U.S. 917, 99

S.Ct. 1236, 59 L.Ed.2d 467 (1979), we believe that the jury reasonably could have found that Barry Klayminc actively participated in an intentional plan to violate the court's injunction. Having established that Sol Klayminc specifically intended to distribute the counterfeits in the United States, the Special Prosecutor advanced proof that Barry Klayminc knowingly and wilfully committed acts to aid Sol Klayminc in the overall scheme to manufacture bags in Haiti for the purpose of selling them in the United States, Europe and elsewhere. Barry Klayminc was not merely present; he voluntarily attended incriminating meetings to which he brought another person, and he discussed specific, purposeful details concerning the logistics of the unlawful plan. These acts and discussions, viewed as a whole, are steps promoting the success of the venture, a venture in which Barry stood to make money. Accordingly, we cannot find that Barry's role was passive or limited to ambiguous conversations. The jury was fully instructed as to the elements of aiding and abetting as well as to the meaning of specific intent. We assume that the jury followed these instructions, *United States v. Hillard*, 701 F.2d 1052, 1059 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983), and that they properly found Barry Klayminc guilty of criminal contempt.

All of the defendants' motions are denied. The parties and counsel shall appear before this Court on March 1, 1985 at 2:00 P.M. for imposition of sentence.

So Ordered.